Brian Keith LORD, Petitioner–
Appellee,

v.

Tana WOOD, Superintendent,
Respondent–Appellant.

Brian Keith Lord, Petitioner–Appellant,

v.

Tana Wood, Superintendent,
Respondent–Appellee.

Nos. 97–99025, 97–99026.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 19, 1998.

Decided July 14, 1999.

John J. Samson, Assistant Attorney General, Olympia, Washington, for the respondent-appellant-cross-appellee.

Peter A. Camiel, Mair, Camiel & Kovach, Seattle, Washington, for the petitioner-appellee-cross-appellant.

Sheryl G. McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, Washington, for the petitioner-appellee-cross-appellant.

Before: BROWNING, KOZINSKI and T.G. NELSON, Circuit Judges.

KOZINSKI, Circuit Judge:

In this capital case we consider whether counsel's failure to call, or personally interview, three witnesses who claim to have seen the victim alive after petitioner is supposed to have killed her, constitutes ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## Background

On the afternoon of September 16, 1986, 16-year old Tracy Parker went out riding a horse belonging to her neighbors Wayne and Sharon Frye. Tracy visited some friends early that evening and, as she was leaving, informed one of them that she planned to return the horse to the Fryes' stable and then "go straight home." At about 8 p.m., Tracy called a friend from the Fryes' residence. When Sharon Frye came home between 8:20 and 8:30, she found the house empty.

Brian Keith Lord was a carpenter who was helping the Fryes remodel their house. The Fryes had told Lord where they kept an extra set of keys, so he could enter the house as he pleased. Lord had met Tracy through the Fryes and had on occasion given her rides home in his brother Kirk's pickup. At 7:44 on the evening of Tracy's disappearance, Lord called his apartment from the Fryes' residence to tell his girlfriend he would be late for a dinner party they were hosting that evening.

At about 8:45, Lord arrived at Kirk's house driving his brother's blue pickup. Don and Radwyn Carroll, Kirk's in-laws, were there when Lord pulled up. The Carrolls had returned from dinner at 8:30. Don testified that Lord drove up "pretty fast" to the workshop next to the house, and that the truck was "smoking and steaming." Don also noticed that Lord was shirtless even though it was only 58 degrees outside. From inside the house, Don saw Lord wash out the back of the pickup with a hose and remove from it an orange or beige blanket. When Don came out to speak to him, Lord said he was building a stereo cabinet in Kirk's workshop. Don asked to see it, but Lord said that he wanted his brother to see it before anyone else. Don did not enter the workshop that evening. Kirk arrived home at about 9 o'clock and talked to Lord in front of the workshop for a while, but Lord did not show him the cabinet and Kirk did not enter the workshop.

Lord arrived at his apartment at 10:15, several hours late for the dinner party. He was to have brought a dining table he was making, but showed up empty-handed. Lord went to the bathroom soon after his arrival and stayed there for some time, prompting some of his guests to leave. When Lord emerged from the bathroom, he acted somewhat strangely and two guests noticed that there was a fresh wound on his arm. Lord did not tell anyone where he had been that evening, but did say that he had been working late.

Tracy's clothing and a red towel were found near a dirt road during the weekend of September 20th, and an orange U-Haul blanket resembling the one Don Carroll had seen Lord remove from the truck turned up in a nearby construction area on September 22nd. Tracy's semi-nude body was discovered on September 30th, a fortnight after her disappearance. Lord was arrested that evening. The medical examiner subsequently determined that Tracy had been killed by a number of blows to the head from a blunt object. There was also evidence that she had been raped after being knocked unconscious.

The State's theory was that Lord offered Tracy a ride home from the Fryes' place sometime around 8 o'clock, but had taken her instead to Kirk's nearby home. No one was there when Lord and Tracy arrived a few minutes after 8, and Lord forced or lured Tracy into Kirk's workshop where he struck her several times about the head with a hammer or similar tool. He proceeded to rape her in his pickup, then drove off with her body in the back.

According to the prosecution, all of this occurred before the Carrolls arrived at Kirk's home at 8:30. Before returning to Kirk's at 8:45, Lord dumped Tracy's body where it was subsequently found (about 3 miles from Kirk's home), and took off his bloodstained shirt.

The jury found Lord guilty of aggravated first-degree murder. After a special sentencing hearing (where the State was permitted to cross-examine Lord after his allocution), the jury determined that there were no mitigating circumstances sufficient to warrant leniency and, based on that determination, the judge sentenced Lord to death.

The Washington Supreme Court affirmed and the U.S. Supreme Court denied certiorari. After exhausting his state remedies by filing an unsuccessful personal restraint petition with the Washington Supreme Court, Lord filed this federal habeas petition. The district court granted the petition as to Lord's death sentence because the state trial court had inappropriately permitted Lord to be cross-examined after his allocution, which ruling the State now appeals. Lord cross-appeals the district court's denial of his three dozen guilt-phase challenges, but we need consider only one.

# I

The right to counsel guaranteed to criminal defendants by the Sixth Amendment "is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see also Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. The Supreme Court in *Strickland* set the bar high for ineffective assistance claims. Petitioner must first establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Recognizing that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," the Court stated: "A fair

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. Such an assessment is highly deferential to defense counsel's decisions at trial, with the attorney presumed to have rendered professionally adequate assistance. *See id.* at 690, 104 S.Ct. 2052. A petitioner may overcome this presumption only by demonstrating that "the identified acts or omissions were outside the wide range of professionally competent assistance," *id.*, meaning that the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case, *see id.* at 689, 104 S.Ct. 2052.

Even if petitioner shows that his lawyer's performance was deficient, he must still prove that this prejudiced his defense. *See id.* at 687, 693, 104 S.Ct. 2052. Though it is not enough for petitioner to establish merely that "the errors had some conceivable effect on the outcome of the proceeding," he is not required to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. 2052. To prove prejudice, petitioner must demonstrate only that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," with a reasonable probability defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Lord's claim of ineffective assistance turns on counsel's failure to call to the stand three witnesses who, if believed, would have cleared Lord of the murder. However, it is impossible to judge any one piece of evidence without understanding the rest of the case. Omission of an item of proof may seem foolish until one understands the tradeoffs counsel would have had to make to include it. Did the item contradict other defense evidence? Was it

so inherently implausible as to undermine defense counsel's credibility? Such questions cannot be answered without a thorough understanding of the case as presented to the jury. We therefore describe what happened at trial before considering the three absent witnesses.

## II

## The Case Against Lord

*Physical Evidence*

To tie Lord to the murder, the State presented physical evidence taken from Tracy's body, her clothing, the red towel, the orange blanket and Kirk Lord's pickup and workshop. The State linked fragments of wood and paint chips, washed sand, sawdust and fibers found on Tracy's body and clothing to similar items found in the pickup and the workshop. Type O human blood, Tracy's blood type, was found on her clothing, the towel and the orange blanket. The bloodstain on the blanket contained an enzyme found in only 9% of the caucasian population, but which was present in Tracy's blood. The State also introduced a matchbook taken from the pickup that was similar to one found under Tracy's clothing.

A coarse body hair that could have come from Lord was found on the blanket, as was a head hair sharing the characteristics of Tracy's hair. Another hair resembling that found on the hairbrush of Lord's girl-friend was discovered on one piece of Tracy's clothing. Coarse body hairs that were similar to both Lord's and Tracy's hair were on the red towel.

Most of the State's blood-related evidence came from Kirk Lord's workshop. Donald Phillips, a state-employed forensic scientist, applied a substance called leuco-malachite green to various surfaces in the workshop. Leuco-malachite green is a reagent that turns green when it comes in contact with blood residue. It is not, how-ever, a specific test for blood, but merely a "presumptive" one because it also reacts to rust, some vegetable juices and certain metals. Phillips testified that the tests he conducted revealed a substance consistent with blood on the workshop floor and other surfaces. He also testified to seeing a positive reaction around the perimeter of a grease stain that Lord had deliberately put on the workshop floor after the murder, presumably to cover traces of blood. On the inside of the workshop's garage door there were drops of Type O blood, which appeared to have hit the door at a high velocity.

However, Phillips was not the ideal witness. He admitted that he had mishandled the testing of a claw hammer, the supposed murder weapon, by spraying it with an excessive amount of leuco-malachite green.[1] He also admitted that he had tried to cover up his mistakes by lying both in an official report and to a superior about the method he used to apply the leuco-malachite green, and that he had been forced to resign because of an internal affairs inquiry into his misconduct in the Lord investigation.

The State's medical examiner testified that Tracy had been killed ten to twenty days before the October 2nd autopsy by numerous blows to the head with a blunt instrument. A wound on Tracy's genitals and the absence of any defensive wounds on her body suggested that she had been raped after being knocked unconscious. The medical examiner concluded that all of Tracy's injuries could have been caused by a hammer similar to the one found in Kirk Lord's workshop.

The State also showed the jury a photograph of the injury on Lord's arm that his guests had noticed on September 16th.

---

1. Phillips disregarded a supervisor's instruction that he apply the leuco-malachite green using the single drop method. This is the preferred method of testing because the reagent is dabbed onto discrete areas, rather than covering the entire surface. By spraying the entire claw-hammer, Phillips made it impossible to retest the hammer under laboratory conditions.

### Lord's Statements

In his first interview with police on September 24th, a little over a week after Tracy's disappearance, Lord said that he had last seen Tracy about two weeks earlier. When asked whether he had visited the Fryes' house on September 16th, he said he had been there for about five minutes to make a phone call to his brother between 6 and 7 p.m. He claimed to have then driven to his brother's house where he "partied" for about an hour. Lord said that no one was at his brother's house while he was there and that he returned to his apartment between 9 and 10 o'clock.

On September 27th, Lord told two detectives that he hoped Tracy was only a missing person. Later that same day, and before Tracy's body was discovered, Lord commented to a friend that he was probably the last person to have seen her alive.

Lord had his second full interview with police three days later. He provided a similar account of his whereabouts and activities on September 16th, but this time he said that he had arrived at Kirk's house between 8 and 9 p.m. and that the Carrolls were there the entire time. According to police, Lord appeared nervous and told them that "he becomes a different person and he loses control" after smoking marijuana and drinking beer. He claimed not to have had any marijuana or beer for about three weeks.

### Testimony from Machinski and DeMars

Robert Machinski, a co-worker of Lord's, testified that he and Lord had used an orange U–Haul blanket at Kirk Lord's workshop on the day before Tracy disappeared. He further testified that, a few days later, Lord had rubbed grease into the floor of the workshop for no reason Machinski could discern. Machinski also claimed that after the arrest Lord had offered him inducements to change his statement to police regarding the blanket. In addition, Lord apparently told his friend Thomas DeMars that he would give his grey pickup and dirt bike to anyone who would claim to have been driving Kirk's blue pickup between 7:30 and 8 p.m. on the 16th. DeMars testified that Lord asked him to do it himself or find someone else who would.

### Testimony of Harvey and Belgard

Rex Harvey, an inmate assigned to Lord as a "trusty" while Lord was in jail awaiting trial, and Sonny Belgard, an inmate occupying a cell near Lord's, testified that Lord had confessed the crime to them. Harvey claimed that Lord told him the following: "I asked her to go cruising around with me at the house I was remodeling, that's where she kept her horse. I hit her in the head with a hammer, raped her in the back of my truck, threw her in a ditch." According to Harvey, Lord also said he "got blood on a U–Haul blanket." Belgard recounted a similar confession with the added detail that Lord had wrapped Tracy's body in a blanket and threw it in the back of the truck before dumping it later on.

### Other Testimony

The State also presented testimony from the investigating detectives to flesh out its theory of the case. Notable was the testimony of Detective Reichert who examined the scene where Tracy's body was found. Reichert testified that the murderer had probably gotten Tracy's blood on him because the body had been carried, not dragged. This supported the State's theory that Lord had removed, and soon thereafter destroyed, his shirt and other bloodstained clothing. Detective Reichert also testified that the murderer had not tried to hide Tracy's body, which was consistent with the State's argument that Lord had hurriedly dumped the body before rushing back to Kirk's house to clean up.

## Lord's Defense

Defense counsel's strategy was to attack the reliability of the State's physical evidence. In particular, they exploited Phillips's admissions of incompetence and misconduct in an effort to cast doubt on the physical evidence he claimed to have gathered at the workshop. They also elicited

testimony from an officer who was with Phillips that he had not witnessed any reaction by the leuco-malachite green to the grease spot on the workshop floor. The defense also highlighted subsequent tests of the claw hammer by state forensic experts which had revealed no evidence of bloodstains or other bodily fluids. *See* note 1 *supra.* The defense presented testimony from its own forensic expert and offered other evidence as to the unreliability of the forensic testing methods employed by the Washington State Crime Laboratory.

As for the two inmates, trial counsel tried to impeach Harvey with certain inconsistencies in his testimony and by presenting evidence of his prior convictions for fraud-related crimes. Lord's attorneys also offered testimony from another inmate who claimed that Belgard had admitted to fabricating the confession in exchange for certain prison privileges, including a five-day furlough with his pregnant wife. Trial counsel also suggested that Harvey and Belgard had come up with the details of the alleged confessions by reading newspaper stories about Tracy's murder. Similarly, they tried to raise doubts about the veracity of Machinski and DeMars's testimony by arguing that the two men were either lying or had misinterpreted Lord's comments.

    *     *     *     *     *     *

The State's case against Lord was strong but not ironclad. It was marred by the misconduct and deception of one of its key investigators, a serious problem for a case that was largely circumstantial. While the evidence of other witnesses was helpful, no witness had seen Tracy and Lord together on the day of the murder. Nor was the State able to pinpoint the exact time of the murder, except by suggesting that it must have happened during the 45 minutes Lord could not account for.

Lord, for his part, had no alibi and no alternative theory of how the crime might have been committed. His defense consisted entirely of casting doubt on various aspects of the State's case. We next consider the evidence the defense lawyers declined to present and how it might have dovetailed with the defense strategy.

## III

### The Three Alibi Witnesses

Two days after Tracy disappeared, a police investigator, Officer Avery, contacted two of Tracy's classmates, Paul Holden and Robert Huff, Jr. They told Avery that they had seen Tracy walking along a local road on the previous day, September 17th. Holden, Huff and a third boy, Greg Ayers, had been driving together when they passed a young woman they believed was Tracy. According to Avery's report, after he "questioned them several times about the location, day and time," Holden and Huff remained "adamant that they were correct and said they are familiar with Tracy and know her well enough to recognize her." A few days later, on September 21st, another policeman, Officer Lewis, spoke with Holden, Huff and Ayers about what they had seen on September 17th. All three confirmed that they had seen Tracy that day, which was a day after Lord is supposed to have killed her.

In October 1986 and again in January 1987, the three boys told essentially the same story to defense investigators hired by Lord's first attorney, Mark Yelish, and his trial counsel, Ron Ness and Judith Mandel. Though there were some inconsistencies in their recollections of what the young woman was wearing, and Huff was somewhat less certain about the exact day than he had been during his September 18th police interview, none of the boys backed down from the assertion that it was Tracy they saw walking along the road on September 17, 1986.[2] Huff and Holden

---

2. Though Huff could not recall the exact date or day of the week he saw Tracy when he was interviewed in January 1987, he sensibly told the investigator that his police statement of September 18, 1986, would have been more accurate as it was given only two days after Tracy disappeared and only a day after he claimed to have seen her alive.

also firmly discounted any suggestion that the young woman might have been Tracy's older sister, Shannon, whom they both knew.[3]

None of the boys had any connection to Lord. Though they knew Tracy from high school, they were not her former boyfriends or schoolyard enemies, but mere acquaintances. All three were willing to testify; none had anything to fear or anything to gain. If the jury had accepted Holden, Huff and Ayers's story that they had seen Tracy that evening, the State's case would have suffered a serious blow, dependent as it was on Lord's mysterious whereabouts and activities between 8 and 8:45 on the evening of September 16th. The State presented no evidence that Lord could have killed Tracy after the time these boys supposedly saw her on September 17th.

What did defense counsel do with these witnesses? Nothing at all. Lord's trial attorneys testified at an evidentiary hearing in district court that they simply did not believe Holden, Huff and Ayers, and had been concerned that putting them on the stand would have harmed their own credibility with the jury. None of the lawyers ever talked to the boys; rather, they relied on the reports of police and investigators. But the first investigator's October 1986 reports merely described the boys' accounts, which were substantially identical to the ones they had given the police in September. The second investigator's January 1987 reports did refer in very general terms to some wavering on which day the boys had seen Tracy, and mentioned the absence of a temporal landmark that would have indelibly fixed that day in their minds. However, nowhere did these reports, or those of police investigators, suggest that the boys' stories were unworthy of belief.

**3.** Shannon testified at Lord's trial that she had been out searching for her sister on Sep-

## Police Reports of September 18 and 21, 1986

On September 18, 1986, two days after Tracy's disappearance, Officer Avery reported that Holden and Huff had told him the following:

[T]hey saw Tracy yesterday (9–17–86) at around noon near the Scandia 'dip' (Virginia Loop & Viking Way intersection). They said she was wearing blue jeans and some description of sweat shirt, which they were unsure of. They said she was walking towards Hwy 308 and looked like she was depressed (hanging head, slow gait, etc.). I questioned them several times about the location, day and time. Both boys were adamant that they were correct and said they are familiar with Tracy and know her well enough to recognize her.

Three days later on September 21st, Officer Lewis spoke to Huff who repeated the story he had told Officer Avery:

HUFF stated that he saw TRACY Eastbound on Hwy 308, towards Keyport, from Viking way, last Wednesday [September 17, 1986]. HUFF stated that TRACY was wearing blue jeans and a multi colored flannel shirt, and that he was positive that it was TRACY, as he saw her full face as they drove by.... HUFF said that TRACY was walking alone, and seemed depressed, but did not appear to have anything else wrong with her.

Officer Lewis spoke to Ayers and Holden that same day. Ayers reported that "he also saw TRACY walking towards Keyport from Viking Way on Wednesday, and thought she was wearing something yellow, possibly a jacket. AYERS stated that there did not seem to be anything wrong with TRACY, and she was alone." Holden provided Officer Lewis with a more detailed description of what he remembered, though he told Lewis that he and his friends had driven by Tracy be-

tember 17th.

tween 5:30 and 6 p.m. on the 17th whereas Officer Avery's report had put the time at noon:

> I ... asked Paul [Holden] when the last time he had seen Tracy PARKER was and he stated Wednesday, 09–17–86, at approximately 5:30 to 6:00 PM. I asked him if he was sure on the date and time and he stated yes, he was positive. I asked where he had seen her and he stated it was just prior to the intersection of Silverdale Way and Viking Way and 308 and Bangor Road which is Luoto Road. Paul stated she was walking on the north side of Highway 308 toward Keyport/Scandia area which was located on the north side of the road.... I asked him if he got a real good look at her and he stated yes, all three in the vehicle did get a look at her because they mentioned to themselves of who she was when they had seen her.... I asked him if he knew what she was wearing and he stated blue jeans and a plaid button-up shirt. I asked if any jacket was seen and he said no.

Holden also explained why he was certain he saw Tracy on September 17th:

> I ... asked [Holden] if he was sure on the date he had seen Tracy PARKER and he stated he was positive because of AYERS. I had him explain and he stated on Wednesday he wouldn't have gone down that way or come back and he had checked and all three of them were in the vehicle on Wednesday (meaning AYERS, him and HUFF) and they went down to pick up AYERS and they were driving back up away from AYERS residence on 308 when they saw Tracy.

Though there were some discrepancies in the boys' statements about what the young woman was wearing and the time of day they saw her, there is no indication from the police reports that Holden, Huff and Ayers wavered in their belief that they saw Tracy walking alone near Highway 308 and Viking Way on September 17th.

### Defense Investigators' Reports of October 1986 and January 1987

Scott O'Neal, a defense investigator hired by Lord's first attorney, interviewed Holden on October 13, 1986. Holden told O'Neal that he, Huff and Ayers had seen "a girl whom they believed to be Tracy Parker on Wednesday, the day after her disappearance between the hours of 5:30 p.m., and 6:00 p.m." Holden went on to say that "he could not testify that he was 100% factually certain that it was Tracy as he only had a five second glance at the girl. He indicated that the girl looked like Tracy Parker to him as well as Bob Huff and Greg Airs [sic]. The three of them agreed that it was Tracy Parker." O'Neal reported that Holden "indicates that he is familiar with Shannon Parker, Tracy's sister. He is certain that the girl that they saw was not Shannon Parker." Holden also reiterated what he had told Officer Lewis that "he was certain that the day of the week was Wednesday [September 17, 1986] because [Ayers] was in the car. [Ayers] was not with him on Tuesday." Finally, O'Neal noted Holden's claim that "none of the boys were drinking that day and none had been smoking any pot on that day. They had spent the day clam digging on Virginia Point Road."

On October 27th, O'Neal interviewed Huff who elaborated on the story he had told to Officers Avery and Lewis:

> After finishing with clam digging [Huff, Holden and Ayers] went to Hadlock and then returned to the Poulsbo area where they pick up Greg at his parent's house. They then headed to [Holden's] house. At the intersection in front of the subbase at Keyport they saw Tracy Parker. [Huff] described her as being dressed in a flannel top wearing blue jeans. He could not recall the color of the flannel shirt.

Huff also claimed to have gotten a good look at the girl: "He indicated also that the car was slowing to a stop at the time that they saw Tracy. He indicated that

Tracy looked at the car." Huff was no less certain than Holden that the girl they saw was not Tracy's sister and that the date was September 17th:

> He knows Tracy's older sister, Shannon. He had two classes with Shannon during his senior year. He has talked with Shannon on numerous occasions. There is no doubt in his mind that the girl that they saw walking along the road was not Shannon Parker. He is also absolutely certain that it was Wednesday evening [September 17, 1986] that they saw Tracy walking on the road. He has no specific recall of what they did on Tuesday. On that following Thursday they played pickleball.

On October 21st, Ayers gave O'Neal a similar account of what happened that day:

> [Ayers, Holden and Huff] were heading to [Holden's] house after clam digging on Virginia Point.... [They] all saw Tracy walking on the side of the road at the intersection just prior to entering the base at Keyport on Highway 308.... He is certain that it was Wednesday [September 17, 1986] that they saw Tracy and believes it was between 4:00 and 6:00 p.m. He indicates that he is reasonably certain that he was not at that location on Tuesday [September 16, 1986]. He could not tell me what it was that he did on Tuesday. He indicates that he does recall what he did on Wednesday of that week. He described the weather as being overcast and somewhat drizzlly on Wednesday.

Unlike Holden and Huff, however, Ayers had "no recall of how Tracy was dressed."

Bob Zornes, a second investigator hired by Lord's trial counsel, interviewed Holden and Ayers on January 6, 1987, about three and a half months after the boys gave their first statements to police. Zornes concluded that "their report that they had seen Tracy Parker on September 17th remained unchanged." He commented, however, that "when pressed

about the exact day they would at times waver. Holden said that he and ROBERT HUFF, JR. had gone clam digging on either Monday or Tuesday of the week beginning September 15, 1986, and that Greg Ayers joined them on the second day, which would have been either Tuesday or Wednesday." Zornes also remarked that "we tried to time reference the incident but about all that they could come up with was that they thought that they were told by Huff's father about Tracy's disappearance the next day, which they said was Thursday. Otherwise their activities were not unusual."

Zornes interviewed Huff by telephone two weeks later on January 19th. Huff "recalled the day that he saw Tracy Parker walking alongside the highway. However, he could not recall the exact date of the sighting, nor the day of the week." Huff then qualified his uncertainty: "He said that the report that he gave to the police would have been the most accurate, since it was fairly recent in relation to when he had seen her."[4] Zornes noted that Officer Lewis had taken Huff's statement on September 21, 1986, and that "[Huff] told Lewis that it was Wednesday [September 17th] that he had seen [Tracy]." The details of Huff's statement about where he saw the girl, her appearance and his certainty that she was not Tracy's sister remained essentially unchanged. As for providing a fixed time reference, Zornes reported that "[Huff] was not able to reference the date any better than previously, saying that he would have to stand by his earlier statement to the police in which he said that he observed her on Wednesday."

Though the reports prepared by O'Neal and Zornes reveal some haziness in the boys' memories, none offers any conclusions as to the accuracy and credibility of their story, or suggests that the boys expressed any significant doubt that they

---

4. Indeed, Huff had been interviewed by police on September 18th, only a day after the sighting, and again a few days later on the 21st.

saw Tracy alive on Wednesday, September 17, 1986.

### Affidavits and Testimony of Holden, Huff and Ayers

In support of his federal habeas petition, Lord presented affidavits and testimony from the now adult Holden, Huff and Ayers at an evidentiary hearing before the district court. Holden's affidavit reaffirmed the story he had told police and defense investigators in 1986:

> On September 17, 1986, I went clam digging with Greg Ayers and Bob Huff at the private beach near Keyport.... As we were returning at about 5:30 that afternoon, we saw a girl that we recognized as Tracy Parker walking east along the north shoulder of Highway 308 about 100 yards east of the intersection with Viking Way.... I was driving the car and got only a brief look at her. But we all agreed that it was Tracy Parker we saw. The location was within a mile or two of Tracy's home, and we assumed at the time that she was walking home.

Holden also stated that,

> [t]here was no question in our minds that this was on Wednesday, September 17.... Greg Ayers and I have talked about this recently and we still agree that Tracy Parker was the girl we saw walking along the highway that afternoon.... After being interviewed by a police officer and the defense investigator, I was somewhat surprised that I was not asked to testify in the murder trial. If I had known at the time that Tracy allegedly was killed the day before we saw her, I really would have been surprised.

Holden's testimony at the evidentiary hearing confirmed the contents of his affidavit:

> QUESTION: At the time that you related that information [about seeing Tracy on Wednesday, September 17th] to the

police, were you confident about the information you were giving police?

> ANSWER: I was confident.

> QUESTION: You were confident about the dates you were relaying to the police?

> ANSWER: I was confident.

> QUESTION: And you were positive that it was Tracy Parker that you had seen?

> ANSWER: I'm absolutely positive it was Tracy Parker.

The affidavits and testimony of Ayers and Huff closely correspond to Holden's, with both men representing that they were sure of the date and the girl's identity when they spoke to police and investigators in the months following Tracy's murder.[5]

### Ness and Mandel's Testimony

At the district court evidentiary hearing, Ron Ness and Judith Mandel, Lord's trial attorneys, testified as to why they did not put Holden, Huff and Ayers on the stand. Ness testified that he had been in possession of the police and first defense investigator's reports, but had decided not to pursue this angle because "[Holden, Huff and Ayers's] observations, based on our investigation, probably were not helpful to what our defense was. Taking into consideration everything." Ness further explained that "[w]e did not believe that [Holden, Huff and Ayers] were accurate. And we were concerned about our credibility with the jury in presenting testimony that may not have been beneficial." However, when asked whether the boys' statements were consistent with their defense that Lord had not murdered Tracy, Ness responded that "[a]s far as whether or not Mr. Lord had committed the crime, they were consistent with that, yeah."

On cross-examination, Ness had this to say of Zornes's report:

---

5. Obviously, Lord's lawyers would not have been aware of these affidavits and testimony, as they did not exist at the time of trial. We consider these materials as an indication of what the lawyers likely could have elicited from the witnesses had they put them on the stand.

If I recall, the gist [of Zornes's report] was that the three individuals were not very positive in either identification or timing.... We felt that [calling Holden, Huff and Ayers as witnesses] would affect our credibility with the jury because of the nature of what we had discovered in terms of their interviews with our investigator and, I believe, with the police.

The court tried, but failed, to elicit more specifics about Ness's concerns:

> COURT: What was it about [Holden, Huff and Ayers's] anticipated testimony that made you think it would damage the defense credibility? Was it what Zornes said, something Zornes said?
>
> ANSWER: That they were not positive that the-that, like I said, the identification and/or the timing was not real strong. And there was such a—if I recall, such a large amount of evidence indicating the last time she'd been seen was on the 16th....

Ness conceded that his judgment of the boys' credibility was based entirely on the police and defense investigators' reports, as neither he nor his co-counsel ever spoke to the boys themselves.

When asked why Holden, Huff and Ayers were not called as witnesses, Mandel gave an even vaguer answer:

> If there were three young men who said they saw her and—said they saw her and knew it was that date and knew it was that time, when we went back through and evaluated that testimony, we decided not to present it.
>
> I mean, I don't know how else to explain that to you. Other than it did not appear to us to be testimony as you're characterizing it. That is, testimony that had this-that linked the time, the place and the date as you have said it.

Mandel was then asked whether she believed "that if you presented the testimony of people who claimed to have seen Tracy Parker after September 16th, that that would open the door to any damaging evidence that would harm Mr. Lord?" She responded, "Open the door—no. I don't think it would open—I don't know how it would have opened any door that would have harmed him."

## IV

"A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir.1999). Mindful of the deference we owe counsel's trial strategy, we nevertheless conclude that counsel's cursory investigation of the three possible alibi witnesses, and their subsequent failure to put them on the stand, constitute deficient performance that was prejudicial to Lord's defense.

Though trial counsel claim that the statements of Holden, Huff and Ayers were vague and/or inaccurate, the police and investigator reports on which they relied in 1987 do not support their judgment. Holden and Huff spoke to the police the day after they saw the girl they thought was Tracy, and again a few days later. These reports were taken the closest in time to Tracy's disappearance and, not surprisingly, contain the fewest discrepancies.[6] The most important elements of the boys' statements remained consistent in each interview with police and defense investigators during the four-month period following Tracy's disappearance and

---

6. The only significant discrepancy was the time of day the boys claimed they saw Tracy, with Officer Avery's notes of his interview of Holden and Huff setting it at about noon and Officer Lewis's report of his interview with Holden setting it between 5:30 and 6 p.m., which was the time the boys stuck to thereaf-ter. However, no one ever asked them about this discrepancy at the time they gave their statements in 1986 and early 1987, and we have no way of knowing whether this was an actual discrepancy or a mistake in Officer Avery's notes.

murder: After going clam digging together on Wednesday, September 17, 1986, they saw a girl they believed was Tracy walking near Highway 308, and were certain the girl was not Tracy's sister, Shannon. Nor did any of the police or defense investigators conclude that the boys' statements were inaccurate. Zornes, for example, merely reported that the boys could not come up with a compelling temporal landmark to fix the day they saw Tracy.

Contrary to trial counsel's impressions, Holden, Huff and Ayers never expressed any significant doubt about the sighting. In 1986 and 1987, they steadfastly told the police and defense investigators that they were sure about their story.[7] To this day, none of the three has wavered from his belief that it was Tracy Parker whom they saw on September 17, 1986. In fact, Ayers maintained in his affidavit that "I have never suggested to anyone that there was doubt [about seeing Tracy on September 17]," a statement echoed by Huff who said in his affidavit that "I have never expressed doubt about the identification or the date."

Though the boys had slightly inconsistent recollections of the sighting, all of the discrepancies were minor and turned on the kind of highly specific details that eyewitnesses often remember differently. Cf. United States v. Ginn, 87 F.3d 367, 369 (9th Cir.1996) (discrepancies in eyewitness accounts of what a robber was wearing and whether he displayed a gun did not render the testimony insufficient to support the robber's conviction). After carefully reviewing the various statements given by Holden, Huff and Ayers over the years, we are struck by the monotonous consistency of their stories and the steadfastness with which they keep insisting that it was Tracy Parker they saw on September 17, 1986.

Trial counsel's failure to present their testimony was all the more questionable in light of the weaknesses in the prosecution's case against Lord. The prosecution had no DNA evidence or witnesses to the murder; no one had seen Tracy and Lord together on the day she disappeared; none of the trace physical evidence introduced at trial conclusively tied Lord to the crime; and much of the blood-related evidence was tainted by Phillips's mishandling of the leuco-malachite green tests, not to mention his subsequent attempts to cover up his mistakes.

Holden, Huff and Ayers's mutually reinforcing statements were probably the strongest evidence of Lord's innocence that trial counsel could have offered. The case they actually presented consisted solely of attacks on the reliability of the State's physical evidence and the credibility of its witnesses; they presented no contrary physical proof, no satisfactory explanation of the inconsistencies in Lord's statements about his whereabouts on the evening of Tracy's disappearance and, perhaps most importantly, no alibi. Holden, Huff and Ayers, three young men with no ties to Lord and with no reason to lie, could have given Lord a formidable defense: The victim was seen walking around well after the time Lord was supposed to have killed her.

Had the jury believed the boys' testimony, Lord's suspicious behavior on the evening of September 16th could have been

---

7. Officer Avery's report: "I questioned [Holden and Huff] several times about the location, day and time. [They] were adamant that they were correct and said they are familiar with Tracy and know her well enough to recognize her." Officer Lewis's report: "I ... asked [Holden] if he was sure on the date he had seen Tracy PARKER and he stated he was positive...." Defense investigator O'Neal's reports: "[Holden] was certain that the day of the week [that they saw Tracy] was Wednesday [September 17, 1986]"; "[t]here is no doubt in [Huff's] mind that the girl that they saw walking along the road was not Shannon Parker. He is also absolutely certain that it was Wednesday evening [September 17, 1986] that they saw Tracy walking on the road"; "[Ayers] is certain that it was Wednesday [September 17, 1986] that they saw Tracy." Defense investigator Zornes's report: "[Holden and Ayers's] report that they had seen Tracy Parker on September 17th remained unchanged."

seen as odd but hardly indicative of murder. Similarly, his efforts to influence testimony might have been dismissed as an innocent man's desperate attempt to concoct an alibi. This would have left Lord's jail-house confessions to witnesses who had been partially impeached and, in any event, were subject to doubt because of their evident self-interest in pleasing the prosecution. Presenting the testimony of the boys would not have entailed significant costs in terms of the defense strategy. Ness and Mandel conceded that the boys' statements dovetailed with their defense and would not have opened the door to any damaging evidence. Nor would the proffer of three witnesses, who were unrelated in any fashion to the defendant or the victim, have tainted Lord's attorneys. The jury might have believed the boys were mistaken, but certainly would not have thought that counsel was presenting manufactured testimony.

■ We would nevertheless be inclined to defer to counsel's judgment if they had made the decision not to present the three witnesses after interviewing them in person. Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial. A witness's testimony consists not only of the words he speaks or the story he tells, but also of his demeanor and reputation. A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand. But counsel cannot make such judgments about a witness without looking him in the eye and hearing him tell his story.[8]

■ Here, counsel appear to have made their decision to exclude the three witnesses based on a vague impression-apparently a misimpression-that the police and investigators who spoke to the witnesses did not find them credible. We find no such suggestion in the various reports, and this impression may have been dispelled had counsel talked to the boys. Having now heard their story-from their affidavits and district court testimony-we believe a competent attorney would not have failed to put them on the stand.[9]

We cannot say that the government's case was so strong that the testimony of these three witnesses could not have raised a reasonable doubt in the minds of the jurors. Rather, we find the possibility that their testimony would have led to

**8.** Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively, see *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir.1998), cert. denied, —— U.S. ——, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998); *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.1986). However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness. The reason for this is simple: A lawyer who interviews the witness can rely on his assessment of their articulateness and demeanor-factors we are not in a position to second-guess.

**9.** Of course, had Lord's attorneys been certain that Holden, Huff and Ayers's statements were false, the rules of professional conduct would have precluded them from putting the witnesses on the stand. *See* Restatement (Third) of the Law Governing Lawyers § 180(1)(c) (Tentative Draft No. 8, 1997) ("A lawyer may not ... offer testimony or other evidence as to a material issue of fact known by the lawyer to be false."). Counsel also were under no obligation "to offer testimony or other evidence that [they] reasonably believe[ ] is false, even if [they] do[ ] not know it to be false." *Id.* § 180(3). However, the Restatement makes it clear that "[a] lawyer should not conclude that testimony is or will be false unless there is a firm factual basis for doing so. Such a basis exists when facts known to the lawyer or the client's own statements indicate to the lawyer that the testimony or other evidence is false." *Id.* § 180 cmt. c. Lord's attorneys have never claimed that they knew the witnesses' statements were false, nor that they were in possession of any facts beyond those contained in the police and investigator reports. Based on that evidence, Lord's lawyers certainly could have concluded that their client was guilty, and that the boys must therefore have been mistaken. But counsel's belief in their client's guilt certainly cannot create an ethical bar against introduction of exculpatory evidence.

Lord's acquittal to be "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. If Holden, Huff and Ayers had testified, the State might still have won a conviction by exploiting the inconsistencies in their accounts or convincing the jury that it was Tracy's sister they saw that day. That, however, would be a very different case. As it is, we find ourselves "in grave doubt as to the harmlessness of an error that affects substantial rights," and must conclude that counsel's omission of this evidence prejudiced Lord's defense. *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

We have found similar omissions of potentially exculpatory evidence to constitute deficient, and prejudicial, performance by counsel. We held in *Brown v. Myers,* 137 F.3d 1154, 1158 (9th Cir.1998), that trial counsel's failure to investigate and put on the stand possible alibi witnesses constituted ineffective assistance which "prejudiced [petitioner] to the extent that it undermines confidence in the outcome of his trial." In *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994), Sanders's brother made out-of-court confessions to the murder for which Sanders was convicted. We determined that counsel's failure to call the brother to testify at trial or, if he invoked the Fifth Amendment, to introduce the brother's extra-judicial statements, was professionally deficient performance. *See id.* at 1457–60. Such evidence would clearly have provided a strong defense and "[counsel's] failure to investigate [was] inexplicable, as [was] his failure to utilize [the brother's] confession, except as the result of incompetence and indifference." *Id.* at 1459. In *Hart v. Gomez,* 174 F.3d 1067, Hart was convicted of molesting his daughter during visits to a camping resort. His daughter had testified that "Hart *never* molested her during visits on which he was accompanied by another adult." *Id.* at 1067. Hart's girlfriend testified at trial that she had been with him during all of the trips alleged in the information, and had witnessed no molestation. *See id.* Hart's trial counsel, however, did not introduce grocery receipts and the girlfriend's personal calendars, which would have corroborated her testimony that she was present at all of the trips and, thereby, "demonstrate[d] [Hart's] factual innocence [.]" *Id.* at 1070. We concluded that "[the girlfriend's] evidence, if believed by the jury, would have demonstrated the truthfulness of her testimony and established that ... no molestation occurred during the time period set forth in the information-or at the least that the molestation as charged in the information had not been proved beyond a reasonable doubt." *Id.*

As in *Brown, Sanders* and *Hart,* Lord's trial counsel had at their fingertips information that could have undermined the prosecution's case, yet chose not to develop this evidence and use it at trial. When questioned about their reasons, they have offered no persuasive justification. Their performance therefore fell "outside the wide range of professionally competent assistance" that *Strickland* requires, 466 U.S. at 690, 104 S.Ct. 2052, and we conclude that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052.

### Conclusion

The district court's order denying Lord's petition for a writ of habeas corpus as to the guilt phase of his trial is REVERSED. The state's appeal is dismissed as moot. We remand to the district court for proceedings consistent with our ruling.