**Johnny Lee RILEY, Jr., Petitioner–Appellant,**

**v.**

**Alice PAYNE, Respondent–Appellee.**

No. 03–35054.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2003.

Filed Dec. 23, 2003.

---

**10.** For the same reason, I would not reach the issue of venue.

---

David B. Zuckerman, Seattle, WA, for the petitioner-appellant.

John J. Samson, Assistant Attorney General, State of Washington, for the respondent-appellee.

Before: TROTT, FISHER, and GOULD, Circuit Judges.

GOULD, Circuit Judge:

Petitioner Johnny Lee Riley, Jr. appeals the district court's denial of his petition for a writ of habeas corpus, which was filed on March 6, 2002 in the United States District Court for the Western District of Washington. Riley was convicted in Washington state court of assault and of carrying a short firearm. His direct appeals and his personal restraint petition in Washington state court were to no avail. In his federal habeas corpus petition pursuant to 28 U.S.C. § 2254, Riley asserted that he received ineffective assistance of counsel at his Washington state court trial; that the prosecutor engaged in misconduct that denied him his right to a fair trial; and that an accumulation of errors violated his right to due process. The district court rejected Riley's claims. Riley appealed. We have jurisdiction under 28 U.S.C. § 2253 and reverse the judgment of the district court.

## I[1]

On June 16, 1994, Riley saw Gustavo Jaramillo and Aaron Calloway drive up in a car to an apartment complex where Riley was visiting a friend. Riley was informed that the car used by Jaramillo and Calloway was for sale. Thinking that his father might want the car, Riley approached Jaramillo and Calloway to express interest in purchasing it. After a conversation with Jaramillo and Calloway, Riley left to find his father, but was unsuccessful. At this point, the parties' accounts diverge.

Riley testified: Riley and an associate, Edward Pettis, returned to talk about the car. Riley asked if Jaramillo and Calloway were in a gang. Jaramillo said they

---

1. We generally recite the facts as established in the state court proceedings and the rulings of the Washington State Supreme Court.

were. Riley, in an ill-starred jest, called Jaramillo a "wanna-be." Jaramillo told Riley he "didn't know who he was f***ing with." Riley responded "yeah, right." Jaramillo then threatened to shoot Riley.[2] In response Riley drew his gun, pointed it at Jaramillo and told Jaramillo to give up his gun. Jaramillo denied that he had a gun, but Riley said he could see a gun in Jaramillo's pants pocket. Jaramillo replied that his gun was in some bushes across the street and that there were police officers across the street. Riley thought these were efforts to distract him. Jaramillo reached for his gun. Riley shot Jaramillo in self-defense and ran.

Calloway testified: In the second meeting, Riley and his associate confronted Calloway and Jaramillo at gunpoint and demanded Jaramillo's gun. Riley attempted to take the gun from Jaramillo. The other man held Calloway down and took his pager. Riley then shot Jaramillo and took his gun.

Jaramillo testified: He arrived at the scene in a stolen car and was armed with a 9–millimeter handgun. Jaramillo said that Riley demanded his gun, but Jaramillo did not remember whether he made any threatening movements after Riley demanded the weapon.

Riley's associate, Pettis, was not called as a witness and did not testify.

Riley was charged with first degree assault, two counts of first degree robbery, and unlawful possession of a short firearm.[3] Trial commenced in Pierce County Superior Court in the State of Washington on November 7, 1994. Riley was represented by attorney Gary Clower. The jury convicted Riley of assault but acquitted him of robbery. On January 11, 1995 Riley was sentenced to a term of imprisonment of 300 months.

Riley filed a direct appeal to the Washington Court of Appeals, asserting that the trial court's "first aggressor" instruction was given in error, that prosecutorial misconduct denied Riley a fair trial, and that the trial court erred in imposing an exceptional sentence. The Washington Court of Appeals rejected these claims on May 21, 1997. On direct appeal to the Washington State Supreme Court, Riley presented only the question of whether the "first aggressor" instruction violated his First Amendment rights. The Washington State Supreme Court on May 13, 1999 held that there was no error.

In another bid for freedom, Riley returned to the Washington Court of Appeals by filing a personal restraint petition, alleging claims of ineffective assistance of counsel and prosecutorial misconduct. The Washington Court of Appeals on August 3, 2001 rejected Riley's ineffective assistance of counsel claims on the merits and held that his prosecutorial misconduct claims were procedurally barred by Washington's "relitigation rule."[4] The Commissioner of the Washington State Supreme Court affirmed, and the Washington State Supreme Court then, on October 25, 2001, denied Riley's motion to modify the Commissioner's ruling.

2. According to Riley's brief, Riley testified at trial that Jaramillo told Riley that he was going to "bust a cap in Riley's ass." This colorful characterization was not challenged by the government, and the state court opinions treated it as a threat to shoot Riley, if Riley's testimony was believed.

3. Before trial, the court granted Riley's motion to sever the firearm count. The parties stipulated to submitting the firearm charge to the judge based on the evidence introduced at trial, and Riley was found guilty of that offense.

4. Washington's "relitigation rule" prohibits relitigation of issues already presented on direct appeal. *In re Taylor*, 105 Wash.2d 683, 717 P.2d 755, 758 (1986). *See also Pirtle v. Morgan*, 313 F.3d 1160, 1165 (9th Cir.2002).

Riley commenced this federal habeas action in the district court on March 6, 2002. On October 17, 2002, the magistrate judge issued a report and recommendation suggesting that Riley's petition be dismissed with prejudice. The district court adopted the magistrate judge's report and recommendation, and denied the petition on December 6, 2002. This appeal followed.

## II

Riley's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA's constrained review permits a federal court to grant habeas relief affecting a state prisoner only when a state court's ruling:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

▆ A state court's decision is "contrary to" federal law if it: (1) "applies a rule that contradicts the governing law" set forth in Supreme Court case authority, or (2) applies controlling law to a set of facts that is "materially indistinguishable" from a Supreme Court decision but nevertheless reaches a different result. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1173, 155 L.Ed.2d 144 (2003). A state court's decision is an "unreasonable application" of federal law only if it is "objectively unreasonable," which "requires the state court decision to be more than incorrect or erroneous." *Id.* at 1174, 123 S.Ct. 1166.

We review a district court's decision to deny a 28 U.S.C. § 2254 habeas petition *de novo*. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.2003). The district court's factual findings relevant to its determination are reviewed for clear error. *Gandarela v. Johnson*, 286 F.3d 1080, 1085 (9th Cir.2002).

## III

Riley claims that he was denied effective assistance of counsel because his lawyer Clower did not interview a key witness, Edward Pettis, and introduce his testimony at trial, and because Clower did not object when the prosecutor made improper closing argument.

Under the Sixth Amendment to the United States Constitution, criminal defendants are guaranteed the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that Riley was deprived of effective assistance of counsel, *Strickland*'s familiar test requires that Riley establish that Clower's performance fell below an objective standard of reasonableness, and that Clower's defective performance actually prejudiced him. *Id.* at 688, 104 S.Ct. 2052.

Riley submitted evidence to the district court that Clower never contacted Edward Pettis to interview him about the case. The record contains no evidence to explain this omission or the fact that Pettis was not called as a witness on Riley's behalf, even though Pettis might have corroborated Riley's testimony that Jaramillo threatened to shoot him. Pettis filed a declaration in Riley's personal restraint proceedings, which was in the record before the district court, stating how Pettis would have testified, if called to testify. Pettis said:

> Johnny [Riley] went up to [Calloway and Jaramillo] to talk about the car. The guys looked and acted like gang members. I remember one of them saying the name of his gang at some point. I'd never heard of it. The conversation was friendly until Johnny [Riley] said some-

thing about the guys being "wanna-bes." I remember those words clearly because everything changed as soon as he said that. Even though Johnny [Riley] was just joking around, the guys got real mad. They started threatening Johnny [Riley].

When one of them said he was going to shoot Johnny [Riley], I ran away. I wouldn't have been afraid of these guys if they didn't have a gun because they were younger and smaller than me and Johnny [Riley]. But when one of them started talking about shooting, he sounded like he really meant it. I think he wanted to prove how tough he was because he thought Johnny [Riley] had insulted him.

I didn't see what happened after that, but I heard a gun go off. Johnny [Riley] met up with me a couple of minutes later and said 'He tried to shoot me.'

. . .

I was never contacted by Johnny [Riley's] lawyer or anybody working for him. If they had asked me, I would have told them the same thing I'm saying now. I would have been willing to testify in court if they wanted me to, and I would have told the truth.

The Respondent–Appellee has not challenged or contradicted Riley's evidence that Pettis was with him on the day of the shooting, and that Pettis would have testified about a threat to shoot Riley, as set forth in Pettis's declaration. And so we must consider *Strickland*'s two-part test, assessing the objective reasonableness of counsel's performance and assessing prejudice, as applied to the facts that Pettis says would have been his testimony had he been called as a witness by Riley's counsel.

### A

■ Under *Strickland*, we first determine whether Clower's performance fell below an "objective standard of reason-

ableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. We have held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir.2002) (quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir.1999)); *see also Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir.1999) (counsel's performance was deficient where counsel failed to interview three witnesses who had material evidence as to their client's innocence). Of course, counsel need not interview every possible witness to have performed proficiently. *LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir.1998) (concluding there was no prejudice where trial counsel had personally interviewed the one eyewitness and read investigative reports and transcripts of interviews with all other witnesses). "However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness. The reason for this is simple: A lawyer who interviews the witness can rely on his assessment of their articulateness and demeanor-factors we are not in a position to second-guess." *Lord*, 184 F.3d at 1095 n. 8 (parenthetical in original).

■ Clower's performance fell below an "objective standard of reasonableness" because he failed to interview Pettis. Having never spoken with Pettis, Clower could not have fully assessed Pettis's version of the events, Pettis's credibility and demeanor, or any other aspect of his involvement that might have reinforced Ri-

ley's defense. *Strickland* held that "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91, 104 S.Ct. 2052. Although counsel here made some investigation (he met with his client Riley at least), counsel did not follow up with Pettis after Riley told counsel Pettis had been with him when the dispute with Jaramillo and Calloway erupted. And the record does not disclose any reason for the failure of counsel to contact Pettis. Thus, the rule of *Strickland* requiring "reasonable professional judgments" before limiting investigation is offended here. The government has provided no testimony of counsel as to why he did not contact Pettis. Having never interviewed Pettis, Clower could not have determined what Pettis would have said about the shooting, whether Pettis would have been a credible defense witness, and whether Pettis should have been called to testify to aid the defense. The record shows that counsel did not make a reasonable professional judgment to ignore an important corroborating witness.

Riley's story was that he acted in self-defense after being threatened with deadly force by Jaramillo. Under Riley's version of the facts, Pettis was present when Jaramillo's verbal threat was made. Counsel should reasonably have considered whether Pettis could effectively testify that in a verbal confrontation before the shooting Jaramillo had threatened Riley's life. Clower unmistakably did not conduct a reasonable investigation that rendered Pettis's testimony, much less an interview, unnecessary. It should have appeared to a reasonable defense counsel that Pettis's testimony might bolster Riley's tale of self-defense. Considering that Clower called only Riley as a defense witness at trial, Clower's failure even to interview Pettis as a possible defense witness was a significant omission. Clower's failure to interview Pettis rendered his performance below an objective standard of reasonableness.

**B**

Under *Strickland,* we next evaluate whether Clower's failure to interview Pettis prejudiced Riley. To establish prejudice, Riley must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

■ ■ Riley's sole defense at trial on the assault charge was that he shot Jaramillo in self-defense. The events that took place when Riley and Pettis approached Jaramillo and Calloway the second time were important. Riley said that he and Pettis came back in peace to negotiate about buying the car. Jaramillo and Calloway both said that Riley came upon them with Riley's gun drawn to rob them. Riley's version was supported solely by his own testimony.

The magistrate judge's report and recommendation, adopted by the district court, reasoned that not calling Pettis could not have mattered because Pettis said that he had run away before the fateful shooting. Stated another way, when Pettis heard Jaramillo threaten to shoot Riley, Pettis ran to avoid threatened danger. It is true that Pettis could not testify whether Riley, with his gun pointed at Jaramillo, saw Jaramillo move as if to go for his gun, leading to a legitimate self-defense shooting. That tale was told, and could only be told, by Riley. But Riley may have been defeated in the jury's mind before that point was even reached.

Riley and the prosecutor were in a race for the hearts and minds of the jury. If

the jury thought that Riley had gone after Jaramillo and Calloway with gun drawn to rob them before the shooting, Riley would lose the race to convince the jury without getting out of the starting blocks. Yet if the jury thought that Riley pulled his gun only in response to Jaramillo's threat to shoot Riley, then Riley's pointing a gun at Jaramillo might be understandable as a defensive action,[5] and the jury would have to decide if Riley's further story about Jaramillo's movement for his gun had a ring of truth. Whether Riley could be believed by the jury was dramatically affected by whether the jury found that Jaramillo had first threatened Riley before Riley pulled his gun.

In this sense, Pettis was a critical witness to lend credibility to Riley's story of threat by Jaramillo and response by Riley. Pettis's testimony would have been " 'consistent with [Riley's] account' and would have created more equilibrium in the evidence presented to the jury." *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir.2002), *amended*, 311 F.3d 928 (quoting *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.1998)). Here, as in *Brown*, "without any corroborating witnesses, [Riley's] bare testimony left him without any effective defense." *Brown*, 137 F.3d at 1158; *see also Anderson v. Johnson*, 338 F.3d 382, 394 (5th Cir.2003) (counsel's failure to call a witness who was one of only two adults to observe the alleged crime prejudiced the petitioner because the witness's testimony "would have been a powerful rebuttal to that of the victim and her minor daughter"). Pettis's testimony was important to support Riley's version of the events, and may have led to a different verdict, but was not considered by Riley's counsel

---

5. Under Washington law, if properly instructed, a jury might have considered that Riley was entitled to draw his gun in response to the verbal threat on his life from Jaramillo if Riley reasonably believed he was in danger of being shot. *State v. Walden*, 131 Wash.2d 469, 932 P.2d 1237, 1239 (1997) (en banc) ("[t]he degree of force used in self-defense is limited to what a reasonably prudent person would find necessary under the conditions as they appeared to the defendant."); *see also State v. Theroff*, 95 Wash.2d 385, 622 P.2d 1240, 1244 (1980) ("[a] person's right to use force is dependent upon what a reasonably cautious and prudent person in similar circumstances would have done and whether he reasonably believed he was in danger of bodily harm. Actual danger need not be present."). However, the verbal threat *alone* would not have justified Riley shooting Jaramillo.

This conclusion is consistent with the Washington State Supreme Court's opinion in Riley's direct appeal. *State v. Riley*, 137 Wash.2d 904, 976 P.2d 624, 628 (1999). In rejecting Riley's direct appeal, the Washington State Supreme Court held that "the giving of an [first] aggressor instruction where words alone are the asserted provocation would be error. . . ." *Id.* at 629. In discussing its holding, the court observed that "a 'victim'

faced with only words is not entitled to respond with force," and that

[f]or the victim's use of force to be lawful, the victim must reasonably believe he or she was in danger of imminent harm. However, mere words alone do not give rise to reasonable apprehension of great bodily harm. If applied in a case like this one, a rule that words alone preclude the speaker from claiming self-defense could lead to the conclusion that insults about a gang affiliation justify a violent response. *Id.* at 628–29. The court thus expressed its rationale that a "victim" of words is not permitted to respond with violence based on the words alone. *Id.* at 629 ("such a rule [where a speaker could be a "first aggressor" based on words alone] would effectively permit *violence* by a 'victim' of mere words . . .") (emphasis added).

Riley's version was that Jaramillo made a genuine threat to shoot Riley. Therefore, Riley was justified in drawing his gun (but not shooting) as a defensive measure in response to Jaramillo's threat to shoot him. However, Riley would not have been justified in using violent force (in the form of shooting Jaramillo) based on Jaramillo's threat alone. The self-defense justification of the shooting requires a jury to believe Riley's story that Jaramillo made a sudden movement for his gun.

Clower who did not contact Pettis or call him as a witness, after Riley alerted Clower to Pettis's knowledge.[6]

The importance of Pettis's testimony is underscored by the "first aggressor" jury instruction. At the close of trial, the jury was instructed that Riley could not claim self-defense if the jury found Riley to be the "first aggressor." [7] Under the prosecution's evidence based on testimony of Jaramillo and Calloway, Riley was the "first aggressor." Under Riley's testimony, uncorroborated because Pettis was not also called to testify, Riley approached to talk about the car, was not the "first aggressor," and drew his gun in self-defense when Jaramillo threatened him. If so, Riley would have been eligible to invoke self-defense. Pettis's knowledge went directly to whether Riley was the "first aggressor." *See State v. Callahan*, 87 Wash. App. 925, 943 P.2d 676, 680–81 (1997) (holding that where defendant pulled his gun because he was "out-numbered [by three men] and fearing for his safety," the evidence tended to show that defendant's fear "was objectively reasonable, the force used was no greater than necessary, and he was not the first aggressor").

It is regrettable that we live in such a violent world that some may forfeit life or health to a perception of disrespect and a resulting violent response. But in this context, a jury could conclude that it would be reasonable for a person whose life was credibly threatened by a young gang member, to draw a gun first for protection. The jury could disbelieve that story, but it would have been more effectively presented if Pettis had been invited to testify at trial. Similarly, the jury could disbelieve that Riley, with gun pointed at Jaramillo, was thereafter threatened sufficiently to justify Riley's use of deadly force. How the stage was set in the jury's mind might have spelled the difference between a verdict of guilt, or instead a trial conclusion of "not guilty" because of reasonable doubt.

We conclude that there is a reasonable probability that, but for Clower's failure to interview or call Pettis, the verdict would have been different. Counsel's unexplained failure to interview a witness who would have said that the victim in anger threatened to shoot Riley undermines our confidence in the jury verdict rejecting Riley's plea of self-defense. We conclude that, under governing standards as established by the United States Supreme Court, Riley was prejudiced by Clower's omission.[8]

---

6. The record contains no statement from Clower regarding why he did not call Pettis. But it does contain evidence of Riley's advice to Clower about Pettis's presence when the verbal threat was made by Jaramillo, and evidence of Pettis's statement that he was never contacted by Clower but if called would have testified that Jaramillo threatened Riley when angered by Riley's characterization of Jaramillo as a "wanna be."

7. This instruction stated:

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense and thereupon use, offer or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

8. Our determination is bolstered by an analysis of the strength of the government's case. We have previously held that our evaluation of *Strickland* prejudice must be considered in light of the strength of the government's case. *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir. 2002), *amended*, 311 F.3d 928, citing *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). In this case, the trial was essentially a credibility contest between Riley on the one hand, and Calloway and

## IV

Because of AEDPA's constrained standards of review, we must proceed further in analysis. The Washington State Supreme Court denied review, thereby affirming the ruling and reasoning of its Commissioner, who had rejected Riley's ineffective assistance of counsel claim in these terms:

> Mr. Riley fails to show that there was no legitimate tactical reason not to pursue Pettis as a witness. Pettis had a criminal record, and he might well have been implicated as an accomplice in Mr. Riley's crimes. And as Pettis admits, he initially misled the police about his knowledge of the incident. Under the circumstances, counsel could have legitimately decided to concentrate on attacking the credibility of Jaramillo and Calloway, who had criminal backgrounds. Moreover, according to his declaration, Pettis would have verified only that someone threatened to shoot Mr. Riley. He evidently did not know whether Jaramillo or Calloway actually had a gun, and he was not a witness to the critical events which ensued. I therefore agree with the Chief Judge [of the Washington State Court of Appeals] that there is no reasonable probability that Pettis's testimony would have changed the outcome.

This determination focused on Pettis's credibility as a potential defense witness and the events to which he could have testified, if called.

■ It appears that the Commissioner's reasoning rejects both deficiency by Clower and prejudice from failure to interview or call Pettis as a witness. The standard identified by the Commissioner was that Riley had to show "counsel's performance fell below an objective standard of reasonableness and that, but for counsel's errors,

there is a reasonable probability that the outcome of the trial would have been different." The Commissioner cited a Washington case, *State v. McFarland,* 127 Wash.2d 322, 899 P.2d 1251 (1995), for the standard under which he was reviewing the claim of ineffective assistance of counsel and that case suggested that Washington courts applied the "2–prong test in *Strickland.*" Thus, it appears that the Washington court decision was purporting to apply *Strickland*'s test. In this sense, we decline to say that the state court decision was "contrary to" the law that the Supreme Court of the United States established in *Strickland,* but we also must assess whether the Commissioner's decision "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in *Strickland.* 28 U.S.C. § 2254(d). Further, to the extent the decision rests on factual grounds, we review only if the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

We see no unreasonable factual determination in the Commissioner's opinion, which rests on what Pettis said in his declaration: when first asked by police about the shooting, Pettis said: "I told them I didn't know anything. I didn't want to cooperate because I had a probation warrant out. Also, I didn't really like to talk with the police because I didn't trust them." Thus, the Commissioner's statement that "as Pettis admits, he initially misled the police about his knowledge of the incident" is technically correct.

■ But the question before us is whether the state court's application of *Strickland* was "unreasonable." The Su-

---

Jaramillo on the other. The record does not indicate that anyone else testified in support of the prosecution's theory of the case on this crucial issue (i.e. that Riley approached Jaramillo and Calloway for the second time with a drawn gun, intending to rob them).

preme Court's precedent says that we cannot lightly so conclude, but can only determine that there has been an "unreasonable application" of federal law if the state court decision is "objectively unreasonable" which means something more than merely "incorrect or erroneous." *Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1173–74, 155 L.Ed.2d 144 (2003). This standard is properly deferential because of the important role that state courts play in applying federal constitutional guarantees and because of federalism concerns that are evoked when we assess whether a state court system holds a state prisoner in violation of the federal constitution.

Even under the narrow constraint of our review under AEDPA and the Supreme Court's precedent, we conclude here that there was an unreasonable application of *Strickland,* an application "objectively unreasonable" that we believe would be soundly decried by any reasonable defense counsel. We are left with the unmistakable conclusion that the Washington State Supreme Court, through its Commissioner, did not properly address the impact of Clower's failure to interview Pettis or call him as a witness. Most striking is the obvious impact that Pettis's testimony could have had on the jury's determination of whether Riley was the "first aggressor." The defense in this case was premised on the factual theory that Jaramillo had threatened Riley's life before Riley drew his gun. Otherwise, Riley was the first aggressor and self-defense could not be found by the jury.

Although we have emphasized the value that Pettis's testimony would have had on the issue of whether Riley was the "first aggressor," there is also significance in Pettis's potential testimony on Riley's self-defense argument regarding the actual shooting. On this issue, Pettis said in his declaration that if called he would have testified: "Johnny [Riley] met up with me

a couple of minutes later [after the shooting] and said 'He [Jaramillo] tried to shoot me.' " If admissible, such a statement by Pettis would directly corroborate Riley's trial testimony that he thought Jaramillo moved for the gun before Riley shot. Although such testimony by Pettis would have constituted hearsay, in our view it is probable that the testimony would have been admitted under the "excited utterance" exception to the Washington evidence rule generally barring admission of hearsay. Wash. R. Evid. 803(a)(2); *State v. Hardy,* 133 Wash.2d 701, 946 P.2d 1175, 1181 (1997) (en banc) (stating that under Washington law, "[e]xcited utterances are spontaneous statements made while under the influence of external physical shock before the declarant has time to calm down enough to make a calculated statement based on self-interest."). *See also State v. Strauss,* 119 Wash.2d 401, 832 P.2d 78, 86 (1992) (affirming trial court's admission of victim's statement regarding sexual assault made over three hours after assault under the excited utterance exception); *Hardy,* 946 P.2d at 1182 (holding that victims' statements made "minutes" after robbery were admissible under excited utterance exception).

To us, this is yet another example of how Clower's failure to interview Pettis resulted in actual prejudice to Riley. Clower never interviewed Pettis, so Clower could not have evaluated Pettis's potentially helpful testimony for use in Riley's defense. The Commissioner of the Washington State Supreme Court incorrectly considered Pettis's potential testimony to be inconsequential. But the Commissioner's analysis not only ignored the significance of Pettis's potential testimony about Jaramillo's verbal threat precipitating the initial confrontation, but also that Pettis could testify Riley told Pettis minutes after the shooting that Jaramillo's movement to his gun provoked Riley's shooting. This

was also an unreasonable application of *Strickland*.

The state court's reasoning also speculated that counsel might have had some "tactical reason not to pursue Pettis as a witness," and noted that Pettis had a criminal record, might have been implicated as an accomplice to Riley and misled police about his knowledge of the incident. Notwithstanding whether such concerns might have justified counsel bypassing the possible use of Pettis as a witness after interviewing him, the record is undisputed that counsel did not contact Pettis, so counsel cannot be presumed to have made an informed tactical decision. Those accusing Riley were gang members. It would have been reasonable for his defense counsel to defend him not only with his own bare testimony but also with that of Pettis who was with him when the alleged threat was made, and who heard Riley's excited comment a few minutes after the shooting.[9]

Further, it was not objectively reasonable for the state court to reject Riley's claim based on the undisputed premise that Pettis did not know for sure if Jaramillo or Calloway had a gun and did not see the final critical events that followed Pettis's flight. The relevant testimony of Pettis, as we have explained, was that Jaramillo had threatened Riley's life and that shortly after the shooting, Riley told Pettis that Jaramillo had tried to shoot Riley. This testimony, if credited by the jury, would have made Riley's story more believable and acceptable as a tale of self-defense. The Washington Court of Appeals acknowledged that Pettis might "have corroborated Riley's assertion that he was threatened," but that court, with all respect, failed to attach sufficient significance to the importance of material, corroborating evidence in this case. The Washington State Supreme Court, through its Commissioner, committed the same error. This was a cast of characters and witnesses of such a nature that corroboration most certainly would have been of critical value to the jury, even from an associate who originally told a different story to the police. The government can be expected routinely to call such cooperating accomplice witnesses in the government's cases in chief (even if these witnesses may have offered a different story before trial) to corroborate the government's version of the events. Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1406–08, 1425–27 (1996). Also, juries can be expected to be keenly interested in whether witnesses should be believed, and here in whether Riley should have been believed when he said Jaramillo threatened him and when Riley said Jaramillo had tried to shoot him. In this sense the use of Pettis as a corroborating witness for Riley might have been all important to corroborate critical parts of Riley's version of the events.

We conclude that the state court's determination was an unreasonable application of the federal law required by *Strickland*

---

9. That Pettis initially did not volunteer information to the police, and said he "didn't know anything," may be understandable given Pettis's record of prior encounters with law enforcement resulting in a criminal record and probation. Those facts do not contradict Pettis's declaration testimony that, if called as a witness by Riley's counsel, Pettis would have testified to what he said was the truth, including that Jaramillo threatened Riley's life, and did so in a way sufficiently alarming that Pettis fled. Pettis's description of the threat in his declaration was as follows: "The conversation was friendly until Johnny [Riley] said something about the guys being 'wanna-bes.' I remember those words clearly because everything changed as soon as he said that. Even though Johnny[Riley] was just joking around, the guys got real mad. They started threatening Johnny [Riley]. When one of them said he was going to shoot Johnny [Riley], I ran away."

because it was objectively unreasonable. To fairly present the theory of self-defense to the jury, we conclude that a reasonably effective defense counsel with Riley's interests in mind should have been alert to and interested in having Pettis testify to back up Riley's story of threat, in the trial that boiled down to the conflicting stories of Riley and Pettis, on the one hand, and Jaramillo and Calloway, on the other. A reasonably effective defense counsel should have at least interviewed Pettis to confirm that Riley's statement about Pettis's knowledge was true and to make an informed judgment about whether Pettis's testimony would help Riley's claim of self-defense. Because Riley's counsel did not interview or call a key witness who would have corroborated Riley's testimony that Riley was not the first aggressor and drew his gun in response to a threat, a key witness who himself fled from the threat, fearful of violence, our confidence in the verdict is undermined, and we are left with the firm conviction that Riley did not get a fair shake from the legal system.

We reverse the judgment of the district court.[10] On remand, the district court shall enter judgment granting a conditional writ of habeas corpus directing that Riley be released from custody unless the State of Washington begins trial proceedings against Riley within a reasonable time as set by the district court.

**REVERSED AND REMANDED.**

---

**10.** Because we grant relief to Riley on his ineffective assistance of counsel claim, we do not reach the balance of the claims that are contained in Riley's petition.