**Adrian K. MITCHELL, Petitioner,**

v.

**Robert AYERS, Jr., Respondent.**

**No. C 00–3479 MMC(PR).**

United States District Court, N.D. California.

March 11, 2004.

Adrian K. Mitchell, PBSP–II, Pelican Bay State Prison, Crescent City.

Scott A. Sugarman, Esq., Sugarman & Cannon, San Francisco.

Christopher W. Grove, Esq., CA State Attorney General's Office, San Francisco.

Gregory A. Ott, Esq., CA State Attorney General's Office, San Francisco.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS; FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHESNEY, District Judge.

Adrian K. Mitchell ("petitioner"), a California prisoner proceeding pro se, filed this habeas corpus petition pursuant to 28 U.S.C. § 2254. After the petition was dismissed with leave to amend, petitioner filed an amended petition containing five cognizable claims for relief.[1] The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer supported by a memorandum and exhibits, contending that the petition should be denied, and petitioner filed a traverse.

On November 21, 2002, the Court ordered an evidentiary hearing to resolve petitioner's claim that his Sixth Amendment right to the effective assistance of counsel was violated insofar as counsel failed to investigate and call Charles Mitchell,[2] as a witness.[3] An evidentiary hearing was held on March 1, 2004 and the matter was argued on March 2, 2004. Petitioner was represented by counsel at

---

1. Unless otherwise specified, the amended petition will be referred to hereafter as the "petition."

2. Charles Mitchell is not related to petitioner.

3. The Court denied petitioner's other claims on their merits, with the exception of petitioner's claim that his appellate counsel was ineffective in failing to raise on appeal the failure by trial counsel to call Charles Mitchell. The Court reserved ruling on this claim until after the evidentiary hearing. Because the Court grants the writ based on the ineffective assistance of trial counsel, it need not address petitioner's claim that he received ineffective assistance of appellate counsel.

both proceedings. At the hearing, petitioner presented the testimony of six witnesses, including himself, and numerous exhibits were entered into evidence. The parties also filed a number of stipulations prior to the hearing and entered into others during the hearing.

## PROCEDURAL BACKGROUND

In 1998, a jury in Alameda County Superior Court convicted petitioner of first degree burglary based on his entry into the home of the Gonzalez family in Oakland, California, in the early morning hours of November 17, 1996. Petitioner was sentenced to thirteen years in state prison. The ineffective assistance of counsel claim at issue in this Court's evidentiary hearing was not raised on direct appeal. Rather, it was raised in a habeas petition in the state superior court and thereafter in a habeas petition in the state appellate court. Both of these petitions were summarily denied. Petitioner then presented the claim to the California Supreme Court in a petition for direct review, which petition likewise was summarily denied.

## FACTUAL BACKGROUND [4]

Members of the Gonzalez family testified that on November 17, 1996, they were sleeping in their home in Oakland, California, when, at approximately 2:00 a.m., they were awakened by petitioner.

Janneth Gonzalez testified that she was sleeping in the bedroom she shared with her infant son and her sister Laura. The closet light had been left on and the closet door was slightly ajar to provide light in the room. Janneth awoke and heard someone running from the kitchen. She saw petitioner run into the room and into the closet and close the door. Janneth thought petitioner said, "Call the police."

Laura testified that she awoke and heard someone pulling down some cassette tapes in the closet. She saw petitioner opening and closing the closet door. Two or three times he told her, "Don't call the police." Janneth testified that two days before the incident, a bag of cassette tapes had been on the floor of the closet; Laura testified that on the day of the incident itself, the tapes had been on the front edge of the upper shelf of the closet.

Reynaldo Gonzalez ("Mr.Gonzalez"), Janneth and Laura's father, testified that he was awakened by a loud noise; he went out into the hallway where he met his daughters. They told him that a man was in their bedroom closet. Mr. Gonzalez and his son Gerardo then entered the bedroom and found petitioner in the closet. Petitioner was facing away and appeared to be going through the clothes in the closet. Gerardo and Mr. Gonzalez testified that petitioner tried to push his way past Mr. Gonzalez, at which time Mr. Gonzalez restrained him and there was a struggle. Mr. Gonzalez testified that petitioner then lifted a mattress up in front of himself. Gerardo testified that petitioner initially said several times, "Don't call the police" and that after the struggle petitioner said, "Call the police." Eventually, petitioner stopped resisting, and Mr. Gonzalez's brother-in law came in and guarded petitioner with a knife while Gerardo called the police.

Both Mr. Gonzalez and Janneth testified that they did not hear any knocking on the front door before petitioner entered the house.

Oakland Police Officer Frank Morrow ("Officer Morrow") testified that when he arrived at the Gonzalez home, he noted that petitioner appeared to be under the

---

4. This background is derived from the opinion of the California Court of Appeal. *See* Respondent's Exhibit F to the Answer.

influence of a stimulant. Petitioner was sweating and breathing hard; he said something like "They're chasing me"; and he responded incoherently to Morrow's booking questions.[5] Morrow testified that crack cocaine can induce paranoia and excitability. Other than the one window through which petitioner entered, nothing in the home was disturbed.[6]

Petitioner testified that he entered the Gonzalez house because he was being chased by a man to whom he owed money. Petitioner testified that he was addicted to crack cocaine and used heroin. He would sell drugs for people he knew and, in exchange keep some of the drugs for himself. Sometimes he would use all of the drugs instead of selling them and, as a result, became indebted to various people; he had frequently been threatened because of his debts. Petitioner had been using cocaine for three days prior to his entry into the Gonzalez home. Petitioner further testified that, at about 2:30 or 3:00 a.m. on the day of the alleged burglary, a car with four black men inside pulled up beside petitioner and someone inside said "Break yourself," meaning give up your money or your drugs. Petitioner ran away, and although he did not look behind him, he thought someone was chasing him because he heard a car door shut. Petitioner ran onto the porch of the Gonzalez home and knocked loudly for a few seconds but there was no answer. He looked back and did not see the car. Because he still feared the men, however, he broke through a living room window and fell into the house. He went into a bedroom closet in the rear of the house to avoid gunfire and told someone to call the police. He did not touch anything in the closet. Petitioner did not try to get away from Mr.

Gonzalez. He raised a mattress in front of himself as protection from gunfire. He told the police that he was being chased.

Petitioner testified that he did not steal to buy drugs, and that he did not need the money because he still had cocaine inside his mouth when he entered the Gonzalez home, although he stated he swallowed it in the police car. Petitioner's girlfriend testified that petitioner sometimes used drugs and that when he did, he acted paranoid and scared.

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21, 96 S.Ct. 175, 46 L.Ed.2d 162 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams (Terry) v. Taylor*, 529 U.S. 362, 402–04, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct gov-

5. Gerardo also testified that petitioner said people were chasing him.

6. Prior to November 17, and unrelated to petitioner's entry, the window had been broken and temporarily repaired with a plastic covering.

erning legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13, 120 S.Ct. 1495. The reasonableness inquiry under the "unreasonable application" clause is objective. *Id.* at 409, 120 S.Ct. 1495. " '[O]bjectively unreasonable' [ ] means something more than merely 'incorrect or erroneous.' " *Riley v. Payne,* 352 F.3d 1313, 1323 (9th Cir.2003) (citing *Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)).

When the state court's denial of a claim is unexplained, as is the case here, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. *Id.* "While [the federal courts] are not required to defer to a state court's decision when that court gives [them] nothing to defer to, [the federal courts] must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." *Fisher v. Roe,* 263 F.3d 906, 914 (9th Cir.2001).

Where a state court has not made a necessary factual finding, the reviewing federal habeas court determines the facts *de novo. Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2540, 156 L.Ed.2d 471 (2003). A summary state court decision by a state court does not "implicitly" make any factual findings in support of the decision. *Fisher,* 263 F.3d at 913.

## FACTUAL FINDINGS

After hearing the evidence presented in connection with the evidentiary hearing in this matter, the Court makes the following factual findings.

Charles Mitchell testified credibly at the evidentiary hearing as to his knowledge of the events leading up to petitioner's entry of the Gonzalez home. In particular, Charles Mitchell testified credibly that he spent time with petitioner on the night and early morning hours of November 16–17, 1996 in an apartment located at 2555 Foothill Boulevard in Oakland, California; that in the early morning hours of November 17, 1996, he saw petitioner standing outside the apartment building and saw a car pull up in front of petitioner; that he heard someone yell from the car, "Break yourself, Nigger," saw someone jump out of the car with a black gun in his hand, and saw petitioner run away towards Irving Street. Charles Mitchell also testified credibly that he and petitioner had been using crack cocaine together earlier that day and that when petitioner used drugs, he would get "kind of paranoid."

Any discrepancies between Charles Mitchell's description of these events and petitioner's description pertained to relatively minor matters[7] or were otherwise explainable. To the extent offered by respondent for purposes of impeachment, the Court also considered Charles Mitchell's criminal history. The impeaching value of those prior convictions, however, is outweighed by a number of factors bearing on credibility, including, *inter alia,* the witness's demeanor while testifying and his lack of any apparent bias, interest or other motive.

---

**7.** For example, Charles Mitchell described the car as black or dark, with four doors and tinted windows, whereas petitioner described the car as blue, with two doors and untinted windows.

The Court also finds that petitioner's trial counsel, Martin Elmer ("Elmer") was informed both before and during the trial that Charles Mitchell was a witness who could potentially corroborate petitioner's testimony that he had been threatened and chased prior to entering the Gonzalez home. In particular, the Court finds credible petitioner's testimony that, at their initial interview on March 5, 1998, he told Elmer about the events that precipitated his entry into the Gonzalez home, including the car and the threat, and that Charles Mitchell was a witness to those events. Petitioner also testified credibly that during the trial he informed Elmer that he had just seen his corroborating witness, Charles Mitchell, in the holding cell. Elmer testified, and provided a declaration, that he could not recall whether petitioner had told him about Charles Mitchell. Although he further testified to his belief that petitioner had not told him about a witness to the events involving the threat, Elmer's recollection was based in considerable part on his notes of his interview with petitioner and his trial notebook. As Elmer conceded, the former were less than complete and the latter had been destroyed. Additionally, prior to the trial and independent of anything petitioner had reported to him, Elmer had received a typed investigation request form prepared by one of petitioner's prior attorneys, Kathryn Siegel, which stated that petitioner had identified Charles Mitchell as a witness who saw petitioner "totally loaded" and "running down the street" on the night of the incident. It was stipulated that this document was in Elmer's file, although Elmer had no recollection of having seen it.

The Court further finds that Elmer could have located Charles Mitchell in time to produce his testimony at petitioner's trial. During the entire course of petitioner's trial, which began on March 9, 1998 and concluded on March 17, 1998, Charles Mitchell was housed in the Alameda County Jail. Moreover, on March 11, 1998, the day the defense presented its case, Charles Mitchell made a court appearance in the same courthouse in which petitioner's trial was being conducted. The evidence was undisputed that Charles Mitchell was in the court holding area along with petitioner on March 11, 1998 and could have been located that day before the defense had rested.

Additionally, the Court finds that, at all relevant times before and during petitioner's trial, Charles Mitchell was willing to testify as a witness to the events of November 16–17. Charles Mitchell testified credibly at the evidentiary hearing that he was willing to testify at petitioner's trial in 1998. This testimony is consistent with petitioner's testimony, also credible, that Charles Mitchell had told him of his willingness to testify, both when they first spoke in the Santa Rita jail facility in early 1997 and again when they saw each other in the courthouse jail during petitioner's trial. Respondent argues that Charles Mitchell, even if initially willing, ultimately would not have testified at petitioner's trial, based on the possibility of self-incrimination. Respondent's showing in this regard is insufficient. Respondent essentially asks the Court to speculate as to all manner of events pertaining to proceedings in the trial court and predict their outcome in a manner consistent with respondent's argument. The Court declines to do so, particularly in light of petitioner's showing, albeit equally speculative, to the contrary. More importantly, the Court gives credence to Charles Mitchell's testimony, under rigorous cross-examination, that he would in fact have testified. In sum, the Court finds Charles Mitchell, if called as a witness at petitioner's trial, would have testified, in accordance with his testimony at the evidentiary hearing, to having witnessed the threat

to petitioner, petitioner's running away in reaction thereto, and any other relevant matters of which he had knowledge.

## LEGAL ANALYSIS

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *See id.* at 688, 104 S.Ct. 2052. In that regard, the relevant inquiry is not what defense counsel could have presented, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

■■■ Generally, trial counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 688, 104 S.Ct. 2052. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052. It is true that if an attorney is not aware of facts that would alert him to the need to conduct a particular investigation, a failure

to investigate is not deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir.2003). In this case, however, Elmer was aware that Charles Mitchell was a potential witness to the events occurring shortly before petitioner entered the Gonzalez home. The investigation request form prepared by Kathryn Siegel alerted Elmer to the fact that petitioner had stated that a man named Charles Mitchell had seen petitioner "totally loaded" and "running down the street," and petitioner himself told Elmer both before and during trial that Charles Mitchell could corroborate his account of the events preceding his entry into the Gonzalez home. Once he was made aware that Charles Mitchell was a witness to these events, Elmer was obligated to follow up with him to determine what he would say and whether he could give credible testimony in support of the defense. *See, e.g., Riley*, 352 F.3d at 1319.

■■■ Of course, the Sixth Amendment does not require counsel to interview every possible witness. *See LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir.1998) (holding performance not ineffective where trial counsel reviewed transcripts of interviews conducted by others). Judicial scrutiny "must be highly deferential," and a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Nevertheless, where no interview has taken place and "where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness." *See Lord v. Wood*, 184 F.3d 1083, 1095 n. 8 (9th Cir.1999). "The reason for this is simple: A lawyer who interviews the witness can rely on his assessment of their articulateness and demeanor—factors that [the courts] are not in a position

to second-guess." *Id.* Here, Elmer never made an assessment of Charles Mitchell as a witness nor did he make a tactical decision as to whether he should be called to testify. As a result, his failure to interview or call Charles Mitchell as a witness is not entitled to the deference normally accorded informed trial strategy.

In its order of November 21, 2002, the Court cited several cases in which the Ninth Circuit found that counsel's failure to interview a corroborative defense witness violated the petitioner's Sixth Amendment rights. *See, e.g., Luna v. Cambra,* 306 F.3d 954, 961–67 (9th Cir.2002) (finding deficient performance and prejudice where counsel failed to investigate and present testimony of corroborating alibi witnesses where defendant's only defense was his own testimony that he was home asleep at the time of the crime); *Brown v. Myers,* 137 F.3d 1154, 1157 (9th Cir.1998) (finding failure to investigate and present alibi witnesses to be deficient performance and prejudicial where, without corroborating witnesses, defendant's defense rested only on his own bare testimony); *Lord v. Wood,* 184 F.3d at 1093–96 (finding deficient performance where counsel failed to personally interview and put on the stand three possible alibi witnesses who would have testified that they saw the victim alive the day after she purportedly was murdered). After this Court issued its order, the Ninth Circuit issued its opinion in *Riley v. Payne,* 352 F.3d 1313, a case in which the circumstances even more closely resemble those presented by the instant case.

In *Riley,* the Ninth Circuit found the petitioner's attorney was objectively unreasonable in failing to interview an eyewitness to the events leading up to the shooting upon which the petitioner's assault conviction was predicated. *See id.* at 1319. There, the petitioner, Riley, claimed he had acted in self-defense. *See id.* at 1315–16. In particular, he testified that the victim of the shooting had verbally threatened to shoot him just prior to his shooting the victim. *See id.* Before the trial, Riley had informed his attorney that a friend, Pettis, was with him at the time the dispute erupted. *See id.* at 1319. In connection with the habeas proceedings, Pettis submitted a declaration that if had he been called as a witness, he would have corroborated Riley's testimony that Riley had not approached the victim with his gun drawn and that the victim had become angry and threatened Riley. *See id.* at 1317–18. Significantly, Pettis also stated that he ran away and, as a result, did not observe the events immediately preceding the shooting. *See id.* The Ninth Circuit nonetheless found Pettis to be a "critical witness to lend credibility to Riley's story," *see id.* at 1320, and that "[i]t should have appeared to a reasonable defense counsel that Pettis's testimony might bolster Riley's tale," *id.* at 1319.

Here, as did Riley, petitioner relied on a single theory of defense. He consistently claimed—to the Gonzalez family, to the police, to his attorneys, and in his testimony at trial—that he did not enter the Gonzalez home to commit a felony, but to escape from individuals who were threatening his life. Whether, the threat was actually made, or only perceived by petitioner in a drug-induced paranoid reaction to an otherwise benign act, Charles Mitchell, as a witness to that event, was exceedingly important to the defense. Without Charles Mitchell, the only evidence presented in petitioner's trial in support of either explanation was petitioner's own uncorroborated testimony. Any potential evidence consistent with his testimony that he ran to the Gonzalez home in a state of fear was therefore "critical." *See id.* at 1320 ("Pettis was a critical witness to lend credibility to Riley's story .... Pettis's testimony would have been consistent with

[Riley's] account and would have created more equilibrium in the evidence presented to the jury.") (internal quotations and citations omitted). As in Riley, "without any corroborating witnesses, [petitioner's] bare testimony left him without any effective defense." *See id.* (internal quotation and citation omitted). Under such circumstances, Elmer's failure to interview Charles Mitchell and to call him as a witness was objectively unreasonable.[8]

■ The Court next must evaluate, under the standard set forth in *Strickland,* whether Elmer's errors were prejudicial. Prejudice exists if there is a reasonable probability that, but for counsel's failure to interview or call Charles Mitchell, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Riley,* 352 F.3d at 1321. To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala,* 334 F.3d at 872–73.

■ Here, if Elmer had interviewed Charles Mitchell, he would have learned that Charles Mitchell had seen a car pull up in front of petitioner, had seen its occupants threaten petitioner, and had seen petitioner running off in the direction of the Gonzalez home. Additionally, Elmer would have learned that Charles Mitchell had seen petitioner using drugs and acting paranoid that night. The Court has found as a factual matter that Charles Mitchell

was available to testify at petitioner's trial before the defense rested, and that if Elmer had called him, he would have provided the foregoing testimony at petitioner's trial.

This was a close case in which the jury deliberated for an entire day after receiving only one and half days of evidence. As noted in the Court's order of November 21, 2002, the prosecution's evidence demonstrating petitioner's intent to steal was relatively slim. As a result, it cannot be said that Charles Mitchell's corroboration of petitioner's testimony would have had an insignificant effect on the jury's evaluation of that evidence. On the other hand, given the absence of any evidence supporting petitioner's testimony as to the threat, it cannot be said that Charles Mitchell's testimony would have been merely cumulative of other evidence offered by the defense. Rather, Charles Mitchell was "a critical witness to lend credibility" to petitioner's story, and his testimony "would have created more equilibrium in the evidence presented to the jury." *See Riley,* 352 F.3d at 1320 (internal quotation and citation omitted). Under such circumstances, as in *Riley,* there is a reasonable probability that the outcome of the case would have been different if the missing testimony had been presented. *See id.* at 1321. Specifically, had the jury heard a witness corroborate petitioner's account of his having been threatened and chased, there is a reasonable probability that they would not have found that he entered the Gonzalez home with the intent to steal.

In order to grant habeas relief, however, the Court must find more than a prejudicial deficiency in the representation peti-

---

8. Respondent, noting Charles Mitchell's record of convictions and his involvement with the use and sale of drugs, suggests that even if Elmer had interviewed Charles Mitchell, he might have had some tactical reason not to call him as a witness. As in *Riley,* however,

Elmer "cannot be presumed to have made an informed tactical decision" not to call Charles Mitchell because the record is undisputed that Elmer never interviewed him. *See id.* at 1324.

tioner received. Rather, "because of the important role that state courts play in applying federal constitutional guarantees and because of federalism concerns," the Court must further find, as noted above, that the state court's denial of petitioner's claim of ineffective assistance of counsel was "objectively unreasonable" within the meaning of 28 U.S.C. § 2254(d)(1). *See id.* at 1323.

 Here, Charles Mitchell was an available witness who would have corroborated petitioner's otherwise uncorroborated testimony as to the reason petitioner entered the Gonzalez home, specifically, that he did so out of fear for his safety and not for the purpose of committing theft. For all of the reasons discussed above, the potential impact of Charles Mitchell's testimony was so great that one cannot describe as "merely incorrect or erroneous," the state court's determination that counsel's failure to interview or call Charles Mitchell as a witness either constituted reasonable performance or was not prejudicial to petitioner. *See id.* Consequently, this Court concludes that "even under the narrow constraint of [its] review under AEDPA and the Supreme Court's precedent," *see id.,* the state court's denial of petitioner's claim of ineffective assistance of counsel was an objectively unreasonable application of federal law as set forth in *Strickland.*

Accordingly, petitioner is entitled to habeas relief.

## CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is hereby GRANTED. Respondent shall release petitioner from custody, unless, with thirty days of the filing of this order and entry of judgment thereon, respondent has filed an appeal with the United States Court of Appeals for the Ninth Circuit or the State has set a date for a new trial.

Petitioner's request for immediate release is hereby DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.