**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRANCIS G. HERNANDEZ, *Petitioner-Appellant*, <br><br> v. <br><br> KEVIN CHAPPELL, Warden, California State Prison at San Quentin, *Respondent-Appellee.* | No. 11-99013 <br><br> D.C. No. 2:90-cv-04638-RSWL <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, Senior District Judge, Presiding

Argued and Submitted September 24, 2018
Pasadena, California

Filed January 14, 2019
Amended May 3, 2019

Before: Kim McLane Wardlaw, Milan D. Smith, Jr.,
and Jacqueline H. Nguyen, Circuit Judges.

Order;
Opinion by Judge Nguyen

## SUMMARY[*]

### Habeas Corpus

The panel filed an order withdrawing the prior opinion in this case, and filed a new opinion, which affirmed the district court's denial of a writ of habeas corpus as to Francis Hernandez's guilt-phase claims relating to his California state convictions for first-degree murder.

The panel addressed two claims of ineffective assistance of counsel. The panel held that trial counsel was constitutionally deficient by failing to present a diminished capacity defense based on mental illness, but that Hernandez did not suffer any prejudice because the evidence of his specific intent to rape *and* kill both victims was overwhelming when compared to the relatively weak diminished capacity evidence that counsel could have presented, but failed to present. The panel held that trial counsel was not ineffective for failing to subpoena Laura Kostiuk as a witness.

### COUNSEL

Tracy Casadio (argued) and Margo A. Rocconi, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Gary A. Lieberman (argued) and Xiomara Costello, Deputy Attorneys General; Jason Tran, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

Kent S. Scheidegger and Kymberlee C. Stapleton, Criminal Justice Legal Foundation, Sacramento, California, for Amicus Curiae Criminal Justice Legal Foundation.

**ORDER**

The opinion filed on January 14, 2019, is amended as follows: on slip opinion page 13, delete the following text: A defendant faces a higher burden of showing prejudice at the guilt phase than at the penalty phase. *See Raley v. Ylst*, 470 F.3d 792, 802 (9th Cir. 2006) ("The bar for establishing prejudice is set lower in death penalty sentencing cases than in guilt-phase challenges and noncapital cases.").

The petitions for rehearing and rehearing en banc are otherwise **DENIED**, no further petitions for rehearing will be accepted. The panel has voted to deny the petition for panel rehearing and to deny the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc.

## OPINION

NGUYEN, Circuit Judge:

In the winter of 1981, Francis Hernandez brutally raped, sodomized, and strangled to death two women, Edna Bristol and Kathy Ryan. Hernandez committed the crimes five days apart and in a strikingly similar manner, including strangling the victims, mutilating their bodies, and leaving them near schools in Long Beach, California. After his arrest, Hernandez confessed, walking the police through every detail of his crimes and his thoughts and motivations as he committed them. In April 1983, a jury convicted Hernandez of two counts each of first-degree murder, forcible rape, and forcible sodomy, and sentenced him to death. The California Supreme Court denied his state habeas petitions.

Hernandez filed a federal habeas petition alleging, among other claims, ineffective assistance of trial counsel. After extensive litigation, including a six-year evidentiary hearing, the district court granted relief in part, vacating the death sentence. The district court denied guilt-phase relief.

Hernandez now appeals the district court's denial of relief as to the guilt-phase claims relating to his first-degree murder convictions.[1] We find that trial counsel's performance was deficient in one respect—he should have investigated and considered presenting a diminished capacity defense based on Hernandez's mental condition. We hold, however, that Hernandez did not suffer any prejudice as a result of counsel's deficient performance. Because the evidence of his specific intent to rape *and* kill

---

[1] The state on appeal does not challenge the district court's grant of penalty-phase relief.

both victims was overwhelming when compared to the relatively weak diminished capacity evidence that counsel could have presented, but failed to present, there was no reasonable probability of a different outcome in this case. We therefore affirm.

## I.

## BACKGROUND

### A. The Murders of Bristol and Ryan

In January 1981, Edna Bristol's nude body was found near a middle school in Long Beach, California. Five days later, Kathy Ryan's nude body was found near a high school in the same city. According to a pathologist, Bristol and Ryan both died of asphyxiation due to strangulation or suffocation, and their bodies suffered "extremely similar and extremely rare" trauma to the anal and vaginal areas, suggesting a large object—consistent with a baseball bat— had been inserted. Their bodies were mutilated, with bite marks on their breasts, and their pubic hair was singed. Bristol had ligature marks around her wrists and ankles. Ryan's nose was fractured, and a tic-tac-toe pattern had been carved into her abdomen post-mortem.

On February 4, 1981, Hernandez was arrested for the crimes.

### B. Hernandez's Detailed Confession

Hernandez gave a detailed, taped confession. He chillingly recounted not only his horrific acts, but also the thoughts and feelings that went through his mind as he committed the crimes. Hernandez explained that on the night of Bristol's death, he "was in a weird mood" and

decided to "find . . . a homosexual to beat up on." He found a male victim, beat him up, and robbed him "for his last ten dollars." When he was done, Hernandez was still feeling "frustrated." It was then that he picked up Bristol hitchhiking.

He became angry when Bristol started telling him "about all her problems" and ordered her out of his van. When she refused, he began to hit her and physically drag her out. Bristol then pleaded that "she'd do anything," and after he "thought about that for a minute," he decided to drive to another location. Once parked, he ordered Bristol to "get in the back" of the van, where there was no exit, and "to take off her clothes." Hernandez explained that he had intended to "let her out" or "let her go" after they "had sexual intercourse," but he went "bezerk" because she was kicking and screaming and damaging his van. He taped her ankles, wrists, and mouth "around the hair," and then, as he described it, "I proceeded to fuck her in her ass." He pushed her body against the hot engine cowling of his van to burn her nipple because he was "mad at her." He then pushed "some piece of material" "over [Bristol's] face" while holding her by the throat until she stopped moving. He threw her body out of the van onto the lawn of a middle school in Long Beach, California. Thinking Bristol was still alive, Hernandez flicked matches onto her pubic area and another match "on her nipple" to "hurt her" for kicking him "in the nuts" and kicking a hole in his van.

Hernandez's confession also walked the police through the night of Ryan's death. He had gone to play pool with friends, including Ryan.[2] After the group disbanded, he

---

[2] The evidence shows that Ryan had repeatedly rejected Hernandez's aggressive advances all evening during the group outing.

went over to Ryan's house and invited her into his van. When he tried to kiss her, "she sort of resisted." She also refused his order to take off her clothes but then said, "oh, okay," when he got angry and "pushed her arms back." At one point, he "thought she wanted it in her ass," and sodomized her. Like Bristol, Ryan was screaming and kicking and, in response, he "grabbed her, [held] onto her, and . . . then she gargled—she . . . sputtered up." He thought that he "was choking her too hard" and "let go." Hernandez told her "to mellow out" but when she started screaming again, he grabbed her throat with one hand and covered her mouth with the other hand. Because "she started struggling really bad," he realized he "must have used too much pressure, but then she stopped struggling." He burned Ryan's pubic hair with a lighter, and decided to cut her stomach and nipple "to make the two bodies look different from one another so that the police could not link the cases together." Hernandez took Ryan's body to the high school "[b]ecause it was his understanding . . . that police sometimes think criminals return to the scene of the crime, and they might have been there waiting for him, had he . . . gone back to the first location" where he left Bristol's body.

## C. Trial and Subsequent History

At trial, Hernandez's counsel attempted to present a diminished capacity defense based solely on voluntary intoxication. Trial counsel argued that Hernandez's heavy drinking prevented him from forming the specific intent necessary for first-degree murder. Counsel tried to persuade the jury that Hernandez's intoxication caused Hernandez to

---

Hernandez told one friend that night that he intended "to make a sandwich out of [Ryan]," "fuck her in the butt until she screams," and "get some [from Ryan either] tonight or tomorrow night."

believe that the encounters with Bristol and Ryan were consensual, and that he did not intend to kill them.

The jury was unconvinced and convicted Hernandez of two counts of first-degree murder, two counts of forcible rape, and two counts of forcible sodomy, and found true special circumstances: that each murder occurred during the commission of rape and sodomy, and that he committed more than one murder. *People v. Hernandez*, 47 Cal. 3d 315, 327 (1988). The jury returned a death sentence as to each murder. On each count of rape and sodomy, the trial court sentenced Hernandez to eight years, to be served consecutively.

On direct appeal, the California Supreme Court vacated one multiple-murder special circumstance, but affirmed the judgment in all other respects.

## D. Habeas Proceedings

In 1989, Hernandez filed a state habeas petition in the California Supreme Court, raising claims of ineffective assistance of counsel, which the California Supreme Court summarily denied. Hernandez then filed a federal habeas petition and returned to state court to exhaust his claims. The California Supreme Court summarily denied Hernandez's second habeas petition as untimely and on the merits. Hernandez subsequently filed an amended federal petition. The state filed a motion for summary judgment, which the district court granted in part and denied in part. The district court then ordered a bifurcated evidentiary hearing as to Hernandez's juror misconduct and ineffective assistance of counsel claims.

In 2011, the district court granted relief in part, vacating the death sentence partly because, at the penalty phase,

counsel presented virtually no mitigating evidence. Had counsel investigated, he would have discovered that Hernandez suffered from a deeply troubled childhood and certain mental deficiencies. On appeal, the state does not challenge the penalty-phase relief.

As to the guilt phase, however, the district court denied the petition. There are two claims of ineffective assistance of counsel that are relevant here. On the first claim, the district court found that counsel was ineffective for failing to present mental health evidence to support a diminished capacity defense, but that Hernandez did not suffer any prejudice. As to Hernandez's claim that counsel was ineffective for failing to call Laura Kostiuk as a witness, the district court ruled that counsel's performance was not deficient, and Hernandez was not prejudiced.

## II.

## JURISDICTION

The district court granted a certificate of appealability ("COA") only on Hernandez's claim that counsel was ineffective for failing to call Kostiuk as a witness, declining to certify the remaining ineffective assistance of counsel claims. We treat Hernandez's appeal from the district court's ruling on the uncertified issues as an application for a COA, Fed. R. App. P. 22(b)(2), and grant the application as to Hernandez's claim that counsel was ineffective by failing to investigate and present a diminished capacity defense based on mental impairment, *see* 28 U.S.C. § 2253(c)(2). We decline to grant a COA as to the remaining claims.

## III.

## STANDARD OF REVIEW

Hernandez filed his federal habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore, pre-AEDPA standards of review apply. *Carrera v. Ayers*, 699 F.3d 1104, 1106 (9th Cir. 2012). "Ineffective assistance of counsel claims present mixed questions of law and fact." *Id.* Under pre-AEDPA law, we review questions of law or mixed questions of law and fact de novo. *Id.* "We review the district court's findings of fact for clear error." *Id.* (quoting *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010)).

## IV.

## DISCUSSION

To prevail on an ineffective assistance of counsel claim, the defendant must show both that counsel's performance was deficient, and that he suffered prejudice due to counsel's deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

## A. Counsel Rendered Ineffective Assistance by Failing to Investigate and Present a Diminished Capacity Defense Based on Mental Illness

Hernandez argues that his counsel was constitutionally deficient by failing to present a diminished capacity defense based on his mental illness. We agree.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. While defense counsel "is strongly presumed to have rendered adequate assistance," we accord deference to counsel only for "strategic choices made after thorough investigation of law and facts relevant to plausible options." *Id.*

"An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *see also United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996) (finding counsel's performance deficient because his errors with regard to the jury instructions were based on "a misunderstanding of the law" rather than strategic judgment); *Morris v. California*, 966 F.2d 448, 454–55 (9th Cir. 1991) (finding counsel's performance deficient because he had not "done his homework" in researching the relevant law).

Here, Hernandez's trial counsel admitted that he was ignorant of the law that was central to a diminished capacity defense, which the district court correctly characterized as Hernandez's "best possible defense." Counsel did not realize that diminished capacity based upon mental illness was an available defense under then-existing California law. *See People v. Saille*, 54 Cal. 3d 1103, 1110 (1991) ("[S]omeone who is unable, because of intoxication or mental illness, to comprehend his duty to govern his actions in accord with the duty imposed by law, cannot act with malice aforethought."). Rather than focus on Hernandez's mental condition, counsel instead chose to limit the evidence to Hernandez's intoxication because, as he explained, he

mistakenly believed that the defense "could only be based on a lack of capacity arising from the use of drugs and/or alcohol." Worse still, counsel admitted that he had no prior experience with presenting the defense, and yet he "neither investigated, nor made a reasonable decision not to investigate" whether the defense would be available. *See Kimmelman*, 477 U.S. at 385–87 (holding that counsel's performance was deficient where his actions "betray[ed] a startling ignorance of the law[—]or a weak attempt to shift blame for inadequate preparation"). Because counsel's failure to investigate and present a diminished capacity defense based on mental illness was unreasonable, his assistance to Hernandez in this respect was constitutionally deficient.

We are unpersuaded by the state's argument that we should reject counsel's stated explanations in favor of hypothetical strategic choices that could have supported counsel's conduct. According to the state, a reasonable defense attorney *could have* decided not to present mental illness evidence in order to limit potentially damaging evidence that Hernandez was a sociopath. "Generally, we credit the statements of defense counsel as to whether their decisions at trial were—or were not—based on strategic judgments." *Doe v. Ayers*, 782 F.3d 425, 445 (9th Cir. 2015). Where, as here, "it 'would contradict [counsel's] testimony'" to presume that counsel's conduct was strategic when counsel clearly stated otherwise, we are guided by counsel's own statements. *See id.* (quoting *Heishman v. Ayers*, 621 F.3d 1030, 1040 (9th Cir. 2010)). To do otherwise would "contraven[e] the Supreme Court's admonition against adopting a *post hoc* rationalization of counsel's conduct instead of relying on an accurate description of their deliberations." *Id.* (internal quotation marks omitted). We have no reason to doubt counsel's

admission that he based his actions on lack of investigation and knowledge, not on any strategic judgment. Accepting counsel's explanations, his conduct was unreasonable under *Strickland.*

## B. Counsel's Failure to Present a Diminished Capacity Defense Based on Mental Illness Did Not Result in Prejudice to Hernandez

To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To make this assessment, we "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)).

### 1. The Jury Heard Overwhelming Evidence of Hernandez's Specific Intent to Rape and Kill Bristol and Ryan

Although Hernandez's trial counsel's performance was deficient, Hernandez must also show that he suffered prejudice due to counsel's conduct. *See Strickland*, 466 U.S. at 687. To succeed here, Hernandez must show a reasonable probability of a different outcome as to *both* first-degree murder theories that were available to the jury: (1) willful, deliberate, and premeditated murder, and (2) felony murder with rape as the predicate felony. That is because the jury had two independent paths to convict Hernandez of first-degree murder. While the jury was required to find that the killing was willful, deliberate, premeditated, and with malice

aforethought under the first theory, it needed only to find that Hernandez had the specific intent to rape under the second theory of felony murder. *See Hernandez*, 47 Cal. 3d at 346–51.

Ample evidence of Hernandez's specific intent to rape and kill both Bristol and Ryan supported the jury's verdict. First, the two crimes were committed within days of each other and were strikingly similar, strongly suggesting premeditation. Bristol and Ryan were around the same age—twenty-one and sixteen, respectively—and both had shoulder-length blonde hair and similar body types. *Hernandez*, 47 Cal. 3d at 328, 341. Both victims were enticed into Hernandez's van, raped, and sodomized. *Id.* at 332–33. Hernandez taped Bristol's wrists, ankles, and mouth with duct tape; tape was also found near Ryan's body. *Id.* at 328, 332. Both victims suffered "extremely similar and extremely rare" wounds to the vagina and anus, likely caused by forcible insertion of a large object, possibly a baseball bat. After each woman struggled and screamed, Hernandez strangled them. Both women were found in the early morning hours, lying naked on their backs, abandoned in grassy fields near schools. Hernandez threw both of their clothes out of his van after driving away from their bodies. Their bodies bore other similar injuries—wounds inflicted by punches to the mouth, significant bruising around their necks, bite marks on their breasts, "puncture-wound type injuries to the nipples," and "singed or burned pubic hair." The injuries "carried significant sexual overtones," and "specifically sexual violence [was] repeated in almost every detail with both victims." *Id.* at 350. The substantial similarities between the crimes showed that Hernandez intended and premeditated both rapes and murders. *Cf. id.* at 341 (characterizing the offenses as "'signature' crimes— because of the unique nature of each killing, it was

reasonable to believe the same person committed them both").

Second, Hernandez's confession was powerful evidence of his intent. He explained the beginning of his attack on Bristol as follows:

> [Bristol] started telling me about all her problems, *and I was mad, and I told her not to tell me about her problems*, and then she started bitching, and I just stopped my van. I got out, walked around and told her to get out, and she wouldn't get out, so I hit her, and I dragged her out of my van, *and then she told me that she'd do anything, and I thought about that for a minute*, and—I don't know it was just that I was drunk and I was in a weird mood, and I just took her and I threw her in the back . . . and then I told her to get out and get in the front, . . . and I proceeded to drive . . . .

(Emphases added). Hernandez parked at another location and told Bristol to "get in the back" and "take off her clothes." There was no exit from the back of the van. *Hernandez*, 47 Cal. 3d at 345 n.18. Hernandez described what happened next:

> [We] had sexual intercourse once, then I was getting up and getting ready to let her go, and I didn't really have her—you know—forcibly. I guess maybe she thought I did, but I don't know—you know. I proceeded to get up and get my clothes on, and I was going to let her out . . . .

(Emphases added).  While Hernandez tried to minimize his conduct by claiming that they had consensual intercourse, his statement reveals, in several respects, his awareness of Bristol's lack of consent and his specific intent to rape her—pondering her plea that she would "do anything[;]" driving to a different location; ordering her to get into the back of the van and take off her clothes; and, after raping her, admitting that he was preparing to "let her go" or "let her out."

Tragically, Hernandez's violence only increased as the evening progressed.  As Bristol struggled and screamed, Hernandez went "bezerk," and, in his own words:

> I just threw her over, taped her up . . . I taped her wrists.  I taped her legs . . . [a]round the ankles, and then I taped her around the hair, and then I proceeded to fuck her in the ass. . . . [A]nd then I told her that if she was good after that; I told her if she was going to be cool, I'd let her up[,] and I was going to let her go, and then when I let her up, she started just kicking and hitting, and kicking and hitting me, so I just put my hand over her and I grabbed some piece of material . . . I pushed that over her face . . . and then—uh—she stopped moving.

Hernandez also admitted to "forc[ing] [Bristol] up against the hot engine cowling of the van in order to burn her breasts."  *Hernandez*, 47 Cal. 3d at 332.  His motivation was clear by his own admission: he suffocated Bristol as punishment for not "being cool" after he violently raped and sodomized her.  And the acts Hernandez took to render Bristol "totally defenseless"—attacking her in the back of

the van, from which she could not escape, and taping her arms, legs, and mouth—also suggested premeditation and intent to kill. *See Crittenden v. Ayers*, 624 F.3d 943, 963 (9th Cir. 2010) (viewing petitioner's gagging and tying of his victims as evidence of premeditation supporting a first-degree murder conviction). In fact, Bristol's "wrists and ankles had been bound so tightly that there were ligature marks on the skin and hemorrhage in the underlying tissues." *Hernandez*, 47 Cal. 3d at 344–45.

Hernandez's confession contains even more compelling details of his intent to rape and murder Ryan. Ryan and Hernandez were friends, and spent time together in a group the evening of her death. The California Supreme Court described Hernandez's actions as follows:

> During the evening of playing pool and drinking beer, it was evident to several in the group that defendant was focusing considerable unwelcome attention on Ryan. He tried to put his arms around her, pinched her in the buttocks and put his hands on her hips, but she kept pushing him away. . . . Outside, defendant told Jackson he wanted to make a "sandwich" out of Ryan; he wanted to "fuck her in the butt until she screams." He told Jackson he would "get some tonight or tomorrow night."

*Hernandez*, 47 Cal. 3d at 329–30.[3] Hernandez's aggressive unwanted sexual touching of Ryan at the bar, and his stated

---

[3] Ryan's stepmother also testified to suspicious circumstances surrounding her daughter's room. The morning after Ryan's death, her stepmother "found the living room lights still on and the drapes and

intent to later "make a 'sandwich'" out of Ryan and "fuck her in the butt until she screams" strongly suggest that he planned ahead of time to sexually assault and rape her. That same evening, Ryan ended up in his van, and although Hernandez again tried to minimize his conduct by claiming that she "submitted freely," the evidence suggests that she was forced. Before the group of friends dispersed from the bar, Ryan's friend overheard Hernandez asking Ryan to meet up with him after the gathering, and Ryan responding "no." Hernandez admitted to the police that Ryan was "hesitant" about having sex with him but when he got "mad," she finally "said oh, okay" because he had pushed her arms down and was about to force himself upon her. Despite Hernandez's self-serving statements minimizing the amount of force used, his intent to rape Ryan is clear.

Hernandez's confession, coupled with the physical evidence, also revealed his intent to murder Ryan. After she was raped and forcibly sodomized, Ryan, like Bristol, was screaming, kicking, and resisting. Hernandez described his response as follows:

> I grabbed her, [held] onto her, and—uh—
> then she gargled—she like sputtered up—you
> know—I guess I was choking her too hard,
> and then I let go, and then she was—I told her
> to mellow out and to start putting her clothes
> on, and I turned around to start doing it again,

---

sliding glass door open. . . . [H]er bedroom window was open and missing its screen." *Hernandez*, 47 Cal. 3d at 328–29. Ryan had told her stepmother she was going out to play pool, but her pool cue and jacket were on the living room floor. *Id.* at 329. "[Her] purse was outside on the ground and items from the purse were spilled out." *Id.* The jury could have believed that Hernandez kidnapped Ryan, which would support a finding of specific intent to rape.

> and then she started screaming again and
> everything, and I just—I don't know—I
> grabbed her, and I just—I tried to shut her up
> and . . . [g]rabbed her around the throat . . .
> [w]ith one of my hands, and put one of my
> hands over her mouth to keep her quiet.

As Hernandez strangled Ryan, he was thinking of how he had killed Bristol in the same way just days before. Ryan had significant bruising around her neck—showing his intent to kill her, not simply quiet her screams. *See People v. Frank*, 38 Cal 3d. 711, 733–34 (1985) (stating that "strangulation . . . [is] a manner of killing [that] shows at least a deliberate intent to kill" and that can "support an inference of premeditation and deliberation"). Significantly, not only was he fully aware of his actions, Hernandez also had the presence of mind to contemplate the consequences. After he killed Ryan, he cut her torso with a piece of glass in a deliberate attempt to make her body look different from Bristol's. Hernandez's chilling insight into his own motivations gave the jury powerful, direct evidence of his willfulness, deliberation, and premeditation.

Finally, the level of detail in Hernandez's confession provided further compelling proof that he was aware of and intended his actions. In a largely chronological fashion, Hernandez walked the police through the events leading up to the rapes and murders, including very specific descriptions of his actions. Apart from detailing his thoughts and motivations, *see supra*, Hernandez admitted to mutilating both of his victims' bodies and described the nature of the markings in detail. Hernandez described burning Bristol and Ryan's pubic hair, explaining that he acted out of anger. He specifically remembered burning Bristol's left breast with a match, distinguishing that burn

from the burns to her right breast caused by pushing her up against the hot car during forcible sodomy. He recounted cutting Ryan's nipple with a piece of broken glass. Significantly, Hernandez described all these details before seeing any pictures of Bristol or Ryan's bodies.

In sum, the jury heard overwhelming evidence that Hernandez had the specific intent to rape both Bristol and Ryan, and that he murdered both women willfully, deliberately, and with premeditation.

## 2. The Relatively Weak Diminished Capacity Evidence Would Not Have Resulted in a Reasonable Probability of a Different Outcome

The strength of the evidence of Hernandez's intent to rape and kill contrasts sharply with the relatively weak "evidence that might have been presented had counsel acted differently"—specifically, evidence that his mental condition rendered him incapable of forming the requisite intent. *See Clark*, 769 F.3d at 728 (quoting *Murtishaw*, 255 F.3d at 940).

At his post-conviction hearing, Hernandez presented testimony from five experts: psychologist June Madsen Clausen, psychiatrist Dorothy Otnow Lewis, criminologist Sheila Balkan, clinical psychologist Charles Sanislow, and neuropsychologist Ruben Gur. *Hernandez v. Martel*, 824 F. Supp. 2d 1025, 1043 (C.D. Cal. 2011). Dr. Sanislow's and Dr. Gur's testimony was used to rebut the findings of the

state's expert, clinical psychologist Daniel Martell.**[4]** *Id.* at 1062–65.

Dr. Sanislow merely reviewed and commented on Martell's discredited evaluation of Hernandez. He found that the absence of bipolar indications in Martell's then-recent testing of Hernandez "[was] not a sufficient basis on which to conclude that Mr. Hernandez is *not* bipolar," and that a negative finding on the administered psychometric test "*does not rule out* the presence or past presence of psychopathology (e.g., dissociative disorders, bipolar or other affective disorders)." (Emphases added). While his conclusions were sufficient, among other reasons, to lead the district court to discount Martell's evaluation, they are certainly not a conclusive diagnosis of bipolar disorder.

Dr. Gur, the second rebuttal expert, believed Hernandez suffers from brain dysfunction. He found "clear[] indicat[ions] that [] Hernandez has deficits in understanding and interpreting facial expressions of affect, which would provide" the basis "for such confusion and misperceptions to have occurred during the commission of the crimes[,] . . . interfer[ing] with his ability to comprehend and formulate an appropriate response to the victims' expressions of resistance and fear," and "significantly interfer[ing] with his ability to make the right judgment." But a lack of good judgment is not equivalent to the inability to form specific intent. Moreover, Hernandez's own statements—even those

---

**[4]** We give no independent consideration to Martell's findings because the district court found significant problems with his methodology and credibility. *See Hernandez*, 824 F. Supp. 2d at 1056.

made to Dr. Gur himself during their evaluation[5]—belie the notion that Hernandez could not perceive the emotions of his victims. On the contrary, Hernandez was able to articulate that his victims were afraid, did not consent to sexual activity, and resisted him. And while, in deposition, Dr. Gur concluded that "either schizophrenia or bipolar illness *is probably applicable* in his case," he also admitted that Hernandez could suffer from something else entirely, "such as attention deficit, hyperactivity disorder, [or] impulse control." *Hernandez*, 824 F. Supp. 2d at 1063 (emphasis added) (quoting Dr. Gur's Dep. Tr.).

Dr. Lewis diagnosed Hernandez with psychosis and bipolar disorder, found that he had "compromised mental functioning," and concluded that his "capacity to form the specific intent to rape and kill[] was substantially impaired" at the time he committed the crimes. Dr. Balkan, a criminologist, provided a social history of Hernandez's life and otherwise largely quoted Dr. Lewis's conclusions. While these evaluations raise concerns about Hernandez's mental stability, they do not show that Hernandez lacked the ability to form the necessary specific intent for these crimes. Dr. Lewis found Hernandez's mental state to be "compromised" and "substantially impaired," but not necessarily inconsistent with the ability to form specific intent to murder and rape. And, as she acknowledged, no single factor in Hernandez's difficult life accounts for his violent crimes.

---

[5] Hernandez told Dr. Gur that Bristol "did not consent to anal intercourse." Dr. Gur does not explain how he concludes that Hernandez could have the mental capacity to commit forcible sodomy in that instant, but lack the capacity to form specific intent immediately before (while raping Bristol) or after (while strangling Bristol).

The final habeas expert was Dr. Clausen, whose opinion comes closest to stating definitively that Hernandez could not have had the necessary specific intent. Dr. Clausen opined that "Hernandez was in a trauma-induced dissociative state" at the time of his crimes, "and as a result, has no subsequent actual recollection of the events that transpired." But the suggestion by Dr. Clausen that Hernandez was in a dissociative state and "had no subsequent actual recollection" of his crimes is totally contradicted by his detailed confession, the voluntariness and reliability of which Hernandez does not dispute.

Even generously construed, these opinions are grossly inadequate to undermine the evidence that Hernandez was capable of forming, and in fact formed, the intent to rape and kill Bristol and Ryan. First, the experts fail to account for the striking similarities between the two crimes. Dr. Gur theorized that mental impairments like Hernandez's could cause someone to "engage in a complex set of behaviors without intent or premeditation," leading to "highly organized if somewhat ritualistic behavior." But Hernandez's behavior does not suggest ritual so much as it expresses an intent to rape and murder Bristol and Ryan because, as Hernandez himself explained, he was angry at their resistance. And none of the other experts even attempted to explain how Hernandez could have committed two such similar crimes within a five-day period without intending to do so.

Second, the experts' reports also fail to counter the overwhelming evidence that Hernandez intended to rape Bristol and Ryan. The habeas experts uncovered no evidence to suggest Hernandez was in a dissociative state when he "thought about" Bristol's offer to "do anything" to save herself from his violence; when, earlier in the evening,

he sexually harassed Ryan and bragged of plans to "get some" later; or when he pushed Ryan's arms down and raped her after she said no to sexual intercourse. In fact, even Dr. Clausen, who speculated that the police fed Hernandez the details of his confession and that Hernandez in fact did not remember much of the crimes due to dissociation, stated that Hernandez had "personal memory up to and including having sex with Edna Bristol in the back of his van." Dr. Gur's dissociation theory was similarly temporally limited, noting that Hernandez's "clinical profile is further indication that he was in a dissociative state during his commission of the crimes*, or at least during some portion of that epoch, e.g., when he killed or inflicted post-mortem injuries*." (Emphasis added). Thus, even assuming Hernandez dissociated during the murders, the experts' conclusions actually support the inference that Hernandez was at least aware of, and intended, his actions during the rapes. The intent to rape alone is enough to support the murder convictions.

Finally, the experts' dissociation theory fails to account for Hernandez's detailed explanation of his actions, thoughts, and motivations during the crimes. Drs. Gur and Lewis surmised that Hernandez's confession suggested that he was in "an altered mental state" on the nights of the crimes based on his statement that he "wasn't even feeling [that] [he] did it," and his request for psychiatric help because he "[didn't] know what would make [him] do this." But "a reasonable jury could have easily chosen to disbelieve [these] self-serving" statements in light of Hernandez's extensive account of his innermost thoughts and motivations on the nights of the crimes. *See United States v. Nicholson*, 677 F.2d 706, 709 (9th Cir. 1982). Moreover, while Drs. Gur and Lewis make much of the fact that Hernandez is persistently "unable" to explain why he committed the brutal

murders, this assertion is squarely contradicted by the record.  Hernandez provided a plausible, albeit deeply disturbing explanation of his motives—he was angry at Bristol for talking too much, kicking him, and kicking a hole in his van, and he was angry at Ryan for screaming and trying to escape.  His explanation of how he expressed that anger (rape, forced sodomy, and strangulation) suggests intentional, premeditated actions and not dissociation or a lack of control that would negate the mens rea required for a first-degree murder conviction.  As the California Supreme Court correctly explained, "clearly the killings occurred when the victims screamed and struggled to get away.  They occurred as a direct product of the sexual assaults and to silence the victims." *Hernandez*, 47 Cal. 3d at 348.

Given the weakness of the omitted experts' evaluations when compared to the overwhelming evidence presented to the jury, we hold that there is no reasonable possibility of a different outcome.  *See Strickland,* 466 U.S. at 694.  Thus, Hernandez's ineffective assistance of counsel claim predicated on counsel's failure to present a diminished capacity defense based on mental illness fails.

## C. Defense Counsel Was Neither Ineffective for Failing to Subpoena Kostiuk as a Witness, Nor Was Hernandez Prejudiced

Hernandez argues that counsel was ineffective for failing to call Laura Kostiuk as a witness.  Kostiuk, according to Hernandez, might have offered testimony that Hernandez and Ryan had previously engaged in consensual sex.  Hernandez contends that this evidence would have undercut the state's theory that he intended to rape Ryan.

Prior to trial, Hernandez's trial counsel had planned to call Kostiuk as a defense witness and had subpoenaed her.

But when the trial date was continued, counsel "simply forgot" to re-subpoena Kostiuk. Defense counsel explained that his failure to re-subpoena Kostiuk was due to his diagnosis of cancer around the time of the second, actual trial date. He would have wanted Kostiuk's testimony "because the issue was whether . . . [Hernandez] had voluntary or involuntary sexual intercourse" with Ryan, and he "could [have done] a lot with [her testimony] and didn't." Hernandez's counsel's failure to call Kostiuk as a witness was based on neglect, not strategy.

Nevertheless, we agree with the district court that counsel's failure to call Kostiuk as a witness does not constitute deficient performance. While "simply forg[etting]" to subpoena a witness certainly could constitute deficient performance, *see, e.g.*, *Lord v. Wood*, 184 F.3d 1083, 1093–96 (9th Cir. 2009), the error did not rise to the level of deficient performance in this case. "While the Sixth Amendment requires an attorney to look for evidence that corroborates the defense he pursues, the Sixth Amendment has not been expanded to require an attorney to hunt down such marginally relevant and indirectly beneficial evidence." *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). At best, Kostiuk may have testified that on a prior occasion, Hernandez and Ryan engaged in consensual sex. Such evidence has minimal probative value, especially in light of the significant evidence that, on the evening of her death, she was brutally raped and sodomized. As the medical examiner explained, Ryan's vagina and anus suffered from "extremely rare" pre-mortem bruising and tearing. Because "the failure to take a futile action can never be deficient performance," *Rupe v.* Wood, 93 F.3d 1434, 1445 (9th Cir. 1996), counsel did not render ineffective assistance by failing to call Kostiuk to testify during Hernandez's trial.

Even assuming that counsel's performance was constitutionally deficient, as discussed, Hernandez did not suffer any prejudice due to the overwhelming evidence of his intent to rape and murder Ryan.

\*          \*          \*

We affirm the district court's denial of a writ of habeas corpus as to Hernandez's guilt-phase claims relating to the first-degree murder convictions.

**AFFIRMED.**